E. MARTIN ESTRADA
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
MACK E. JENKINS (Cal. Bar No. 242101)
Assistant United States Attorney
Chief, Public Corruption & Civil Rights Section
SUSAN S. HAR (Cal. Bar No. 301924)
J. JAMARI BUXTON (Cal. Bar No. 342364)
Assistant United States Attorneys
Public Corruption & Civil Rights Section
PATRICK CASTAÑEDA (Cal. Bar No. 319431)
Assistant United States Attorney
International Narcotics, Money Laundering,
& Racketeering Section
        1500 United States Courthouse
        312 North Spring Street
        Los Angeles, California 90012
        Telephone: (213) 894-3289
        Facsimile: (213) 894-6436
        E-mail:    Mack.Jenkins@usdoj.gov
                   Susan.Har@usdoj.gov
                   Jamari.Buxton@usdoj.gov
                   Patrick.Castaneda@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

                    UNITED STATES DISTRICT COURT

                FOR THE CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,            No.  CR 20-326(A)-JFW-4

            Plaintiff,               GOVERNMENT'S SENTENCING POSITION
                                     AND OBJECTION TO THE PRESENTENCE
                 v.                  INVESTIGATION REPORT; ATTACHMENT
                                     A; EXHIBITS A-F
SHEN ZHEN NEW WORLD I, LLC,

            Defendant.


        Plaintiff United States of America, by and through its counsel

of record, the United States Attorney for the Central District of

California, hereby files its Sentencing Position and Objection to the

Presentence Investigation Report for defendant Shen Zhen New World I,

LLC in the above-captioned case.

1      The government's Sentencing Position and Objection to the

2  Presentence Investigation Report is based upon the attached

3  memorandum of points and authorities, the supporting attachment and

4  exhibits, the files and records in this case, the Presentence

5  Investigation Report, the Recommendation Letter, and such further

6  evidence and argument as the Court may permit.

7

8  Dated: January 2, 2023          Respectfully submitted,

9                            E. MARTIN ESTRADA
                            United States Attorney

10

11                       SCOTT M. GARRINGER
                       Assistant United States Attorney
                       Chief, Criminal Division

12

13                         /s/
                       SUSAN S. HAR

14                       MACK E. JENKINS
                       J. JAMARI BUXTON

15                       PATRICK CASTAÑEDA
                       Assistant United States Attorneys

16

17

18

19

20

21

22

23

24

25

26

27

28

# **Table of Contents**

MEMORANDUM OF POINTS AND AUTHORITIES.................................1

I.    INTRODUCTION...................................................1

II.   STATEMENT OF FACTS.............................................3

      A.   Evidence at Trial........................................3

      B.   Jury's Verdict...........................................4

III.  THE PRESENTENCE INVESTIGATION REPORT..........................5

IV.   THE GOVERNMENT'S SENTENCING RECOMMENDATION....................6

      A.   The Court Should Impose the Full $4,000,000 Fine.........7

      B.   The Court Should Impose a Five-Year Term of Probation....9

           1.   Publication (Condition 13).........................10

           2.   Compliance and Ethics Program (Conditions 14-15)...11

           3.   Submissions Regarding Financial Information
                (Conditions 4, 16, 17).............................13

           4.   Community Service (Condition 18)...................13

      C.   The Costs of Prosecution Should Be Imposed..............15

V.    CONCLUSION....................................................16

# **<u>Table of Authorities</u>**

**Page(s)**

Cases

<u>United States v. Danilow Pastry Co.</u>,
  563 F. Supp. 1159 (S.D.N.Y. 1983) ................................. 6
<u>United States v. Gering</u>,
  716 F.2d 615 (9th Cir. 1983) .................................... 15
<u>United States v. Lowe</u>,
  654 F.2d 562 (9th Cir. 1981) ..................................... 9
<u>United States v. Mitsubishi Int'l Corp.</u>,
  677 F.2d 785 (9th Cir. 1982) ................................. 2, 6
<u>United States v. Patel</u>,
  762 F.2d 784 (9th Cir. 1985) .................................... 15

Statutes

18 U.S.C. § 3553(a) .............................................. 6
18 U.S.C. § 3553(a)(1) ........................................... 7
18 U.S.C. § 3563(b) .............................................. 9
18 U.S.C. § 3563(b)(12) ......................................... 13
28 U.S.C. § 1918 ................................................ 15

Rules

U.S.S.G. § 2C1.1(a) .............................................. 5
U.S.S.G. § 2C1.1(b)(1) ........................................... 5
U.S.S.G. § 2C1.1(b)(3) ........................................... 5
U.S.S.G. § 8B1.3 ............................................ 13, 14
U.S.S.G. § 8C2.5(a) .............................................. 5
U.S.S.G. § 2B1.1(b)(1)(H) ........................................ 5
U.S.S.G. § 8B2.1 ................................................ 11
U.S.S.G. § 8C2.4(a)(1) ........................................... 5
U.S.S.G § 8C2.6 .................................................. 6

**Table of Exhibits**

| Ex. | SZNW Trial Ex. | Description | Cites(s) |
|---|---|---|---|
| A | 227 (pp. 23-24) | 12/12/2018 East West Bank Default Letter to Jose Huizar | 4 |
| B | 284E | 2/5/2016-2/17/2016 Esparza-Huizar Text Messages | 4 |
| C | 5 | SZNewworld.com – Organization | 7 |
| D | 157B (p. 18) | 8/5-8/7/2016 Cosmopolitan Player Report for Wei Huang | 8 |
| E | 473 | Huizar Family Money Flow Summary Chart | 4 |
| F | 474 | Casino Trips-Huizar Money Flow Chart | 4 |

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

**I.    INTRODUCTION**

3    During the five-year period from 2013 to 2018, defendant Shen

4  Zhen New World I, LLC ("defendant" or "SZNW") acting primarily

5  through its owner, fugitive co-defendant and Chinese billionaire Wei

6  Huang, engaged in a brazen scheme to bribe Councilmember Jose Huizar

7  with a lavish stream of benefits.  Those benefits included:

8    • All-expense paid trips on private jets to Las Vegas,

9         complete with luxurious stays at penthouse villas, world-

10        class meals, and prostitutes;

11   • A political-career-saving $600,000, secretly provided

12        through a shell company using a disbarred attorney to

13        quietly settle a sexual harassment lawsuit against Huizar.

14   • Hundreds of thousands of dollars' worth of gambling chips

15        passed in Vegas; and

16   • An all-expense paid international trip to Australia with

17        tens of thousands of more dollars in gambling chips;

18    Defendant corruptly and unapologetically provided these benefits

19  motivated by plain, selfish greed and ambition: so that Jose Huizar

20  would use his power as a Councilmember and Chair of PLUM to help

21  approve a billion-dollar project to redevelop the L.A. Grand Hotel,

22  thereby fulfilling Huang's dream to make his mark in the lucrative

23  U.S. real estate market by building the tallest skyscraper west of

24  the Mississippi River.  Following an eleven-day trial, the jury

25  swiftly and firmly found defendant SZNW guilty of all eight counts,

26  each of which related to its bribery scheme.

27    For defendant's long-lasting and aggravating criminal conduct, a

28  firm sentence is required to reflect the seriousness of the offense,

promote respect for the law and provide just punishment. Importantly, a firm sentence is needed to protect the public from further crimes by this company, which <u>continues to operate a multi-million-dollar business within this district with the same culpable Chairman at its helm</u>.  It is further needed to deter other development companies and would-be bribers who seek to deprive citizens of their right to the honest services of public officials and to cheat the system for profit.  The strong need for adequate deterrence is beyond mere speculation.  The underlying investigation in this matter has revealed a culture of corruption in the City of Los Angeles that is fostered by the lucrative real estate development market, coupled with the unique discretionary power wielded by Los Angeles government officials over that market, allowing them disproportionate control over which development companies succeed and which fail.

The specific circumstances of this case, and the "special problem" that a corporate criminal defendant like SZNW cannot be incarcerated, demand a comprehensive and creative sentence to serve the § 3553(a) goals of sentencing.  <u>United States v. Mitsubishi Int'l Corp.</u>, 677 F.2d 785, 788 (9th Cir. 1982) ("Corporate criminal defendants present a special problem because they cannot be incarcerated.").  Here, an appropriate and necessary sentence means imposing the maximum statutory fine (which is still massively below the base fine range), a significant term of probation with meaningful terms and conditions, and the costs of prosecution.

The government therefore respectfully recommends that the Court impose the following sentence: (1) a $4,000,000 fine; (2) a five-year term of probation with the government's requested terms and

1  conditions; (3) the mandatory special assessment of $3,200; and

2  (4) an order to pay the costs of prosecution.

3  **II.   STATEMENT OF FACTS[1]**

4       **A.   Evidence at Trial**

5       The sole owner of defendant SZNW is the billionaire Chairman and

6  Chinese national, Wei Huang.  (11/4/22 Trial Tr. (Zheng) at 1496;

7  11/1/22 Trial Tr. (Esparza) at 750-51.)  In 2010 and 2011, Huang

8  purchased two properties in Los Angeles: the LA Grand Hotel for $63

9  million and the Sheraton Universal for $90 million, respectively.

10  Huang formed the defendant company to purchase and maintain the L.A.

11  Grand Hotel.  At the time of purchase, Huang intended to redevelop

12  the L.A. Grand Hotel, as well as the Sheraton, both of which would

13  need to go through the Los Angeles City approval process, over which

14  then-Councilmember Jose Huizar held arguably the most significant

15  power and influence in the City.

16       In 2013, Huang--through an introduction facilitated by Raymond

17  Chan--met Councilmember Huizar and his Special Assistant George

18  Esparza (another public official) and began his bribery scheme.

19  (11/1/22 Trial Tr. (Esparza) at 754-55.)  Under that scheme,

20  defendant SZNW, through Wei Huang, showered Huizar and Esparza with a

21  stream of benefits to influence Huizar to approve the future

22  redevelopment of the L.A. Grand Hotel.  The evidence at trial

23  established that those benefits took the form of 20 paid trips to Las

24  Vegas, including lavish accommodations, private jets, meals, and

25  other expenses.  The evidence also established that Huang passed

26

27  _____

28       [1] Unless otherwise indicated, all facts herein are drawn from
   the Presentence Investigation Report ("PSR").  (Dkt. No. 879 ¶¶ 18-
   21.)

Huizar over $200,000 in gambling chips during the course of those trips.

In 2014, defendant, via Huang, provided Huizar with $600,000 to use as collateral for a private loan by East West Bank so that Huizar could secretly settle a career-threatening sexual harassment lawsuit. Huizar made interest-only payments to the East West Bank loan for several years, including by laundering the same gambling chips that Huang passed him through his mother and brother. (See Exs. E, F [Trial Exs. 473, 474].)  In 2018, East West Bank collapsed the loan and seized the collateral, reflecting an approximately $575,000 windfall to Huizar. (Ex. A [Trial Ex. 227 at 23-24].)  Huang never sought payment from Huizar for the seized funds, and Huizar never paid Huang for it.

In addition to the Vegas trips, defendant, via Huang, took Huizar on an all-expense-paid international trip to Australia, including by paying for Huizar's business-class airfare costing almost $11,000.  Huizar pocketed approximately $32,800 (Australian dollars) in gambling chips from that trip, which reflected additional bribes from Huang. (Ex. B [Trial Ex. 284E].)  Huang also paid for a trip to Pebble Beach, including via a chartered jet costing approximately $20,000.

## B.  Jury's Verdict

Following an eleven-day trial, and after approximately just three hours of deliberation, defendant SZNW was convicted by the jury of all eight counts against it:

- three counts of honest services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346;

- four counts of interstate and foreign travel in aid of
  bribery, in violation of 18 U.S.C. § 1952(a)(3); and

- one count bribery concerning programs receiving federal
  funds, in violation of 18 U.S.C. § 666(a)(2).

Moreover, with one exception, the jury made all of the special findings available to them in the twelve-page special verdict form. (See Dkt. No. 813.)

The jury specifically found that, for the honest services wire fraud counts, defendant provided financial benefits to Jose Huizar intending to receive multiple official acts for the redevelopment of the L.A. Grand Hotel.  Under Count Two, the jury also found that defendant's scheme affected a financial institution; namely, East West Bank, which provided the loan to Huizar based on defendant's $600,000 collateral.

## III. THE PRESENTENCE INVESTIGATION REPORT

On December 19, 2022, the United States Probation Office ("USPO") disclosed the PSR and its recommendation letter.  (PSR; Dkt. No. 878 ["PSR Ltr."].)  USPO made the following guidelines calculation:

| | | |
|---|---|---|
| Base Offense Level | 12 | U.S.S.G. § 2C1.1(a) |
| More Than One Bribe | +2 | U.S.S.G. § 2C1.1(b)(1) |
| Value of the Payment >$550,000 | +14 | U.S.S.G. §§ 2C1.1(b)(2), 2B1.1(b)(1)(H) |
| Elected Public Official | +4 | U.S.S.G. § 2C1.1(b)(3) |
| **Total:** | **32** | |

Based on the foregoing Offense Level of 32, USPO concluded that the base fine under U.S.S.G. §§ 8C2.4(a)(1), (a)(d) is $30,000,000. (PSR ¶ 59.)  USPO also found that defendant had a total culpability score of 5 under U.S.S.G. § 8C2.5(a).  (PSR ¶¶ 60-66.)  Because a

5

culpability score of 5 establishes a minimum multiplier of 1.00 and a maximum multiplier of 2.00, see U.S.S.G § 8C2.6, the total fine range is **$30,000,000 to $60,000,000** prior to the limitation of the statutory maximum.  (PSR ¶ 70.)

However, the statutory maximum set forth in 18 U.S.C. § 3571(c)(3) limits the fine amount to $500,000 per count. Accordingly, based on the eight counts of conviction, the total guideline fine amount is capped at **$4,000,000**.  (PSR ¶¶ 74, 76.)

The government concurs with USPO's calculation of the guidelines and base fine, culpability score, and total guideline fine amount of $4,000,000.

IV.   **THE GOVERNMENT'S SENTENCING RECOMMENDATION**

When it comes to sentencing, "[c]orporate criminal defendants present a special problem because they cannot be incarcerated." Mitsubishi, 677 F.2d at 788 (upholding sentence requiring corporations to loan executives for one year to a community organization and to make a contribution of $10,000 for each violation to said organization).  Monetary penalties often offer insufficient deterrence as wealthy or large corporate defendants can "just write a check and walk away."  Id.  For this reason, courts must frequently "adopt 'unique and creative' sentences" when it comes to the punishment of corporate defendants.  United States v. Danilow Pastry Co., 563 F. Supp. 1159, 1166 (S.D.N.Y. 1983) (quoting Mitsubishi, 677 F.2d at 788).

Additionally, 18 U.S.C. § 3553(a) requires courts to "impose a sentence sufficient, but not greater than necessary . . . to reflect the seriousness of the offense," "promote respect for the law," "provide just punishment," "afford adequate deterrence," and "protect

6

the public from further crimes of the defendant."  In fashioning the sentence, courts must also consider "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1).  USPO's sentencing recommendation, along with the government's additional recommended condition of probation and imposition of the costs of prosecution, meets these goals.

**A.   The Court Should Impose the Full $4,000,000 Fine**

Both the government and USPO recommend a $4,000,000 fine, and nothing less than that full amount should be imposed, which reflects a mere fraction of the $30,000,000 to $60,000,000 fine that the Guidelines otherwise recommends based on defendant's culpability and repeated and egregious criminal activity.  Due to the operation of the statutory maximum, the $4,000,000 fine is less than 15% of the amount required by the base fine with a 1.00 multiplier calculation, and less than 7% of the amount required based on a 2.00 multiplier calculation.

Imposing the full allowable fine is necessary, particularly given the seriousness of the conduct at issue and the history and characteristics of the main culpable actor, Wei Huang.  This five-year bribery scheme was brazen, devised and carried out with impunity by the sole owner and highest authority for the company--Chairman Huang--with the help of his employees and associates acting under his direction.  The maximum fine amount reflects just a drop in the bucket for Huang, who wholly owns not only the defendant-subsidiary SZNW, but the multi-billion-dollar parent corporation in China.  (See PSR ¶ 32; see also Ex. C [Trial Ex. 5]; 10/31/22 Trial Tr. (Chan) at 485-86 (Shen Zhen New World Group is the parent company of Shen Zhen U.S.A).)

The evidence at trial established that Wei Huang used his enormous wealth to effectuate the scheme.  Huang maintained a $2 million line of credit at each of the casinos that he frequented in Las Vegas.  (11/8/22 Trial Tr. (Alexander) at 1983.)  Huang bribed Huizar not only with hundreds of thousands of dollars in gambling chips, but he also used his high-roller status to provide Huizar access to luxurious penthouse suites, black car limo services, private jets, expensive meals, alcohol, spa services, and entertainment.  Huang routinely gambled millions of dollars and would lose $2 million in a single trip without breaking a sweat.  (11/8/22 Trial Tr. (Alexander) at 2026-26.)  For example, Trial Ex. 157B showed that during Huang's three-day Vegas trip from August 5 to August 7, 2016, he was in for a total of $10,944,000 and ultimately lost $1,945,600.  (Ex. D [Trial Ex. 157B at 18].)

The evidence at trial also showed that the redevelopment of the L.A. Grand Hotel was to be a billion-dollar project and that defendant stood to reap enormous profits from the success of that project.  (11/2/22 Trial Tr. (Keller) at 676 (L.A. Grand redevelopment would be a billion-dollar project); 11/3/22 Trial Tr. (Chen) at 1433-35 (millions of dollars of operational income projected for hotel), 1436-37 (millions of dollars projected for sale of condos).)  According to the PSR, the L.A. Grand Hotel has continued to operate throughout the time the First Superseding Indictment ("FSI") pending and during this trial.  (PSR ¶¶ 34-36.)  Moreover, defendant SZNW has advised USPO that, even after its convictions, it intends to undertake a $25- to $35-million renovation of the L.A. Grand Hotel.  (PSR ¶ 37.)  Each of these considerations serves to underscore the modest punitive effect that a $4 million

1   fine will have on this defendant.

2       Finally, there can be no question that Huang's wealth is what

3   has permitted him to remain a fugitive from justice and evade his own

4   accountability, all while paying to get a free preview of the

5   government's case in the trial against his company, which was based

6   almost exclusively on his own conduct as the head of SZNW.  The full

7   allowable fine of $4 million should be imposed.

8       **B.   The Court Should Impose a Five-Year Term of Probation**

9       Courts have "broad discretion in setting probation conditions,"

10  United States v. Lowe, 654 F.2d 562, 567 (9th Cir. 1981), so long as

11  they "are reasonably related to the factors" identified above, 18

12  U.S.C. § 3563(b).  All of the probation conditions identified in the

13  PSR are reasonably related, and in fact necessary, to address the

14  § 3553(a) factors.

15      USPO's recommended five-year term of probation should be

16  imposed.  Probation is highly appropriate in this case because it is

17  necessary to ensure changes are made within the organization to

18  reduce the likelihood of future criminal conduct and to accomplish

19  the goals of sentencing under 18 U.S.C. § 3553(a).  See U.S.S.G.

20  § 8D1.1.  Probation is particularly necessary in light of defendant

21  SZNW's apparent unwillingness and/or inability to undertake the one

22  glaringly obvious remedial measure that surely would have occurred at

23  any other corporation with a bona fide governance structure: the

24  prompt termination and condemnation of the main culpable actor, Wei

25  Huang, who committed the bribery scheme.  Instead, it appears that

26  Huang maintains his role at the helm of SZNW from China, all while

27  continuing to reach into the Central District of California to carry

28  on with business as usual for the L.A. Grand Hotel.  Even more

                                   9

troublingly, this is true even as Huang continues to evade his own federal criminal charges by remaining a fugitive from justice and refusing to appear in this district, all while benefitting from the district and profiting off of its citizens.

The government joins in all of USPO's recommended terms and conditions (Conditions 1-17), as set forth in its recommendation letter.  (PSR Ltr. at 1-3.)  The government provides its position, explanation, and expansion on certain of these conditions below. Additionally, as detailed below, the government recommends a substantial term of community service as an additional condition of probation (Condition 18).  Because the current PSR omits a community service condition, the government objects on that basis.

      1.   <u>Publication (Condition 13)</u>

As a condition of probation, "[t]he court may order the organization, <u>at its expense and in the format and media specified by the court</u>, to publicize the nature of the offense committed, the fact of conviction, the nature of the punishment imposed, and the steps that will be taken to prevent the recurrence of similar offenses." U.S.S.G. § 8D1.4(a) (emphasis added).

The government strongly supports Condition 13, which requires SZNW to notify the public of its criminal behavior, what it was convicted of, and the changes made within the organization to reduce the likelihood of future criminal conduct and negligence.  (PSR Ltr. at 3.)  USPO's proposed format and three carefully selected media-- publications on the defendant company's website in both the Chinese and English languages, the L.A. Times, and the World Journal (the largest Chinese language newspaper published in the United States)-- are important to achieve the goals of sentencing, particularly as it

1  relates to promoting respect for the law and furthering specific and

2  general deterrence.  (PSR Ltr. at 3.)

3              2.   Compliance and Ethics Program (Conditions 14-15)

4        The Court may also order a defendant organization to develop and

5  submit an effective compliance and ethics program that would require

6  the defendant to exercise due diligence to prevent and detect

7  criminal conduct and to promote an organizational culture that

8  encourages ethical conduct and a commitment to compliance with the

9  law.  U.S.S.G. §§ 8B2.1, 8D1.4.

10        The government joins USPO's recommendation to develop and submit

11  to the Court an effective compliance and ethics program (Condition

12  14) and, once approved, to provide notice of the program and its

13  criminal behavior to its employees and shareholders (Condition 15).

14  (PSR Ltr. at 3.)  The government has outlined a proposed compliance

15  program tailored to defendant's conduct and its current operations in

16  this district, as set forth in Attachment A.

17        The establishment of an effective corporate compliance and

18  ethics program is an indispensable component of defendant SZNW's

19  probationary sentence.  The long-standing bribery scheme (2013-2018)

20  began soon after defendant SZNW was established within California--

21  and almost immediately after Huang first met Huizar--and so its lack

22  of a "prior history of misconduct" hardly carries any weight.  (See

23  PSR ¶ 40.)  Rather, that defendant SZNW's criminal conduct was

24  facilitated by the highest-ranking principal of the company and

25  multiple other employees working at his direction, demonstrates a

26  history, pattern, and culture of corruption (and tolerance for

27  corruption) within the organization.  Defendant SZNW currently has no

28  compliance plan in place.  (PSR ¶ 40.)

Many of the same circumstances that gave rise to the bribery scheme in the first instance remain true, even today.  Besides the removal of Jose Huizar as a councilmember, little has changed. Huang, despite causing defendant SZNW to be convicted of eight federal felonies and being personally charged for the same conduct, remains the Chairman and sole owner of SZNW.  (PSR ¶ 32.)  Defendant SZNW has continuously operated the L.A. Grand Hotel.  (PSR ¶¶ 34-36.) And defendant has stated its intention to put in $25- to $35-million in renovations for the L.A. Grand Hotel in the coming future-- activity that would require the company to interface with City entities like the Department of Building and Safety and the Planning Department and, depending on the renovation, may mean going through the City approval process.

If defendant SZNW is to continue with its <u>same</u> business with the <u>same</u> head of the company that led it to commit a calculated bribery scheme in this district, it must at a minimum implement a substantive compliance and ethics program to prevent future criminal conduct and to begin the work of reforming its current corporate culture of promoting and tolerating criminal activity for profit, to one that allows only the strictest of compliance with the law.  And in order for any such program to be effective, employees and shareholders--the ones responsible for operating within that program--must be notified of the program and of the no-longer-acceptable criminal behavior that gave rise to the program.  (<u>See</u> PSR Ltr. at 3.)  The implementation of this program also sends the much-needed message to the residents and other businesses of Los Angeles that they are engaging with a company that now abides by the law and operates on an even playing field.

### 3.    Submissions Regarding Financial Information (Conditions 4, 16, 17)

For many of the foregoing reasons, the government joins USPO's recommendation of conditions requiring defendant SZNW to submit information relating to its finances and to submit to a reasonable number of examinations of its books (Conditions 4, 16, 17).  (See PSR Ltr. at 2, 3); see also U.S.S.G. § 8D1.4(b) (recommending these financial information conditions when appropriate).  USPO maintains that these conditions are "needed to give the Probation Officer the ability to monitor business activities to prevent further fraud and bribery from reoccurring."  (PSR Ltr. at 5.)

The reasonable monitoring of defendant SZNW's finances is appropriate here based on Huang's various methods of orchestrating financial bribes to Huizar and Esparza.  During defendant's probationary period, these conditions will provide oversight by USPO of any potential malfeasance or improper use of SZNW's finances.  The conditions also obligate defendant to be accountable to USPO, based on the knowledge that USPO will periodically review its finances and records (and will have the ability to review and query its finances and records).  These conditions are inherently beneficial because they serve to prevent and deter defendant SZNW or any of its employees/agents from misusing or diverting any of its funds for criminal purposes in the knowledge that its finances are court-monitored, consistent with the goals of § 3553(a).

### 4.   Community Service (Condition 18)

Finally, the Court may order community service as a condition of probation where such community service is reasonably designed to repair the harm of the offense.  U.S.S.G. § 8B1.3; 18 U.S.C.

13

§ 3563(b)(12).  An organization can perform community service only by employing its own resources or paying its employees or others to do so, thereby acting essentially as an indirect monetary sanction. U.S.S.G. § 8B1.3 commentary.

As part of the probationary term, the government recommends that community service be imposed as condition 18.[2]  Specifically, the government recommends that defendant be ordered to perform 5,000 hours of community service, a meaningful portion (at least 25%) of which must be performed by high-level personnel within the company, over the course of the 5-year probationary term.[3]  It should be further ordered that the community service be performed to benefit the low-income Los Angeles community by, for example, volunteering at homeless shelters, mental health treatment facilities, post-conviction rehabilitation centers, and food banks.

Defendant was convicted of three counts of the deprivation of honest services by wire fraud.  The jury necessarily found that defendant devised or knowingly participated in a scheme or plan to deprive the City of Los Angeles or its citizens of their right of honest services.  (Dkt. No. 812 [SZNW Jury Instructions] at 20.) Community service is appropriate to repair some of the harm inflicted by these offenses and for SZNW to give back to the citizens of Los Angeles.  The indirect monetary sanction posed by the community service requirement, while less desirable than a direct monetary

---

[2] Again, the government's objection to the PSR is based on the current omission of a community service condition of probation.

[3] A 5,000-hour requirement, over a five-year probation period, represents 1,000 hours per year, or approximately 83 hours a month. If even two SZNW employees spent just one full workday a month performing community service, defendant would satisfy this requirement.

1    sanction, is also appropriate under the circumstances and provides

2    more direct benefits to the Los Angeles community than a further

3    monetary sanction payable to the federal government.

4         **C.   The Costs of Prosecution Should Be Imposed**

5         Under 28 U.S.C. § 1918, the court may order the defendant

6    company to pay the costs of prosecution.  <u>See</u> U.S.S.G. § 8E1.3;

7    <u>United States v. Patel</u>, 762 F.2d 784, 795-96 (9th Cir. 1985)

8    (affirming the district court's order imposing on the convicted

9    defendant the costs of transferring the case from the Northern

10   District of California to Guam because the court found that the

11   "change of venue to Guam was a strategic attempt to obtain a more

12   favorable jury, rather than a genuine attempt to avoid

13   inconveniencing witnesses").  This is true even if the defendant is

14   convicted under a substantive criminal statute that does not

15   specifically authorize an award of the costs of prosecution.  <u>United</u>

16   <u>States v. Gering</u>, 716 F.2d 615, 626 (9th Cir. 1983) (collecting

17   cases).

18        Such an order here is wholly appropriate.  The L.A. Grand Hotel

19   bribery scheme reflects one of the most substantial portions of the

20   RICO scheme and of this complex, multi-year investigation and

21   prosecution.  Indeed, the FBI's five-year investigation began because

22   of a tip from the Palazzo about Jose Huizar and Wei Huang in Las

23   Vegas together.  The SZNW matter necessitated the expenditure of

24   significant government resources to investigate, charge, and try.

25        The government is continuing to gather its documented and

26   itemized costs from this prosecution and will submit a bill of costs

27   one week before the time of the sentencing hearing.

28

                                     15

## V.   CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court impose the following sentence: a $4,000,000 fine; a 5-year term of probation with all the terms and conditions set forth in the PSR Letter, plus the government's proposed compliance program outlined in Attachment A and 5,000-hour community service condition; the mandatory special assessment of $3,200; and an order to pay the costs of prosecution, as reflected in the government's forthcoming bill of costs.

**ATTACHMENT A**

Based on defendant's (referred to below as "the Company")
conduct, the government requests at least the following specific
terms be mandated by the Court-ordered compliance and ethics program:

**(A)   Policies and Procedures**

The Company will develop and promulgate compliance policies
and procedures designed to reduce the prospect of violations of
the anti-bribery/anti-corruption laws and the Company's
compliance code, and the Company will take appropriate measures
to encourage and support compliance by personnel at all levels
and locations of the Company.  These anti-bribery/anticorruption
policies and procedures shall apply to all executives,
directors, officers, and employees regardless of location.  It
shall also apply to other current and future affiliates of the
Company.  The Company shall notify all employees that compliance
with the policies and procedures is the duty of individuals at
all levels of the Company.  Such policies and procedures shall
address (with particular focus on public and elected officials):

       (a) gifts;

       (b) hospitality, entertainment, and expenses;

       (c) customer travel;

       (d) political contributions to individuals and
       Political Action Committees (including prohibitions on
       conduit and foreign national contributions);

       (e) charitable donations and sponsorships;

       (f) facilitation payments; and

       (g) solicitation and extortion.

### (B)   Proper Oversight and Independence

The Company will designate an officer or employee to serve as the Company's Chief Compliance Officer for the implementation and oversight of the Company's anti-bribery/anticorruption compliance code, policies, and procedures, including for guidance and advice about compliance with such code, policies, and procedures.  The Chief Compliance Officer shall have direct reporting obligations to independent monitoring bodies and shall have an adequate level of autonomy from management, as well as sufficient resources and authority to maintain such autonomy.

### (C)   Training and Guidance

The Company will implement mechanisms designed to ensure that its anti-bribery/anticorruption compliance code, policies, and procedures are effectively communicated to all executives, directors, officers, employees, and, when necessary and appropriate, agents and business partners.  These mechanisms shall include periodic training for the following employees:

(a) all executives, directors, and officers;

(b) all employees in positions of leadership or trust;

(c) all employees in positions that require such training, such as corporate, community, government and congressional affairs, internal audit, sales, real estate, legal, compliance, and finance; and

(d) employees of agents and business partners in the above positions, when necessary and appropriate.

The Company will also require that all people in the above-described categories annually certify that they have received the necessary training and have complied with the law and the

18

1  Company's anti-bribery/anti-corruption compliance code,
2  policies, and procedures.

3     **(D)   <u>Internal Reporting and Investigation</u>**

4     The Company will maintain, or when necessary establish, an
5  effective system for internal reporting and, when possible,
6  confidential reporting by, executives, directors, officers,
7  employees, and, when appropriate, agents and business partners
8  concerning violations of the anti-bribery/anticorruption laws or
9  the Company's anti-bribery/anti-corruption compliance code,
10 policies, and procedures.  The Company will maintain, or when
11 necessary establish, mechanisms to prevent any personnel action
12 from being taken against any individual making such a report.

13     The Company will also maintain, or when necessary
14 establish, an effective and reliable process with sufficient
15 resources for responding to, investigating, and documenting
16 allegations of violations of the anti-bribery/anti-corruption
17 laws or the Company's anti-bribery/anti-corruption compliance
18 code, policies, and procedures.

19     **(E)   <u>Enforcement and Discipline</u>**

20     The Company will implement mechanisms designed to
21 effectively enforce its compliance code, policies, and
22 procedures, including appropriately incentivizing compliance,
23 disciplining violations, and re-assessing its compliance code,
24 policies, and procedures to identify modifications necessary to
25 ensure that the overall anti-bribery/anti-corruption compliance
26 program is effective.  Such procedures should be applied
27 consistently and fairly, regardless of the position held by, or
28 perceived importance of, the executive, director, officer, or

employee.  The Company shall implement procedures to ensure
that, when misconduct is discovered, reasonable steps are taken
to remedy the harm resulting from such misconduct and to ensure
that appropriate steps are taken to prevent further similar
misconduct.

         **(F)**   **Third-Party Relationships**

    The Company will institute risk-based due diligence and
compliance requirements pertaining to the retention and
oversight of agents and business partners, including:

          (a) conducting properly documented due diligence
pertaining to the hiring, and appropriate and regular
oversight of, agents and business partners;

          (b) informing agents and business partners of the
Company's commitment to abiding by anti-bribery/anti-
corruption laws, and of the Company's anti-
bribery/anticorruption compliance code, policies, and
procedures; and

          (c) seeking a reciprocal commitment from agents and
business partners.