CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
CHARLES J. SNYDER (Bar No. 287246)
Email: Charles_Snyder@fd.org
ADAM OLIN (Bar No. 298380)
Email: Adam_Olin@fd.org
Deputy Federal Public Defenders
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-2854
Facsimile: (213) 894-0081

Attorneys for Jose Huizar

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JOSE LUIS HUIZAR,<br><br>Defendants. | Case No. CR-20-326-JFW<br><br>**JOSE HUIZAR'S SENTENCING POSITION**<br><br>**PUBLIC REDACTED VERSION** |

Jose Huizar, through counsel, hereby files his sentencing position.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

Dated: December 28, 2023

/s/ *Charles J. Snyder*

Charles J. Snyder
Adam Olin
Attorneys for Jose Huizar

## TABLE OF CONTENTS

PAGE

I.    INTRODUCTION ........................................................................... 1

II.   BACKGROUND ............................................................................ 6

      A.    Born into poverty in rural Mexico, Mr. Huizar's childhood instilled in him the values of hard work, education, service, social justice, and a commitment to bettering himself and the lives of others........................... 6

      B.    The first in his family to go to college, Mr. Huizar attended U.C. Berkeley, where he emerged as a leader in student government, Princeton, where he studied public policy and planning with an analytical focus, and UCLA Law, where he concentrated on public-interest, real estate, and environmental law, all of which would later coalesce during his tenures in LAUSD and Council. ........................ 8

      C.    Mr. Huizar enters public life as a Board Member, then President, of LAUSD, where his success leads to his election as the Councilmember for CD-14. .............................................................................. 10

      D.    Mr. Huizar spends 15 Years on the Council working to help his constituents throughout his district with issues large and small. ............... 12

      E.    Mr. Huizar embraced a nuanced development policy oriented toward serving the local community. ................................................ 15

            1.    Downtown.................................................................... 16

                  a.    Mr. Huizar sought to make a Downtown Los Angeles befitting a world-class city. ................................. 16

                  b.    Mr. Huizar sought to build tens of thousands of homes in DTLA. ....................................................... 17

                  c.    Building DTLA served the interests of the city as a whole.......................................................... 17

                  d.    Mr. Huizar sought to improve DTLA through means besides major development. ................................. 18

            2.    East and Northeast Los Angeles. .................................... 20

      F.    Mr. Huizar's major policy initiatives bettered the city for all. ................. 21

            1.    Homelessness................................................................ 21

            2.    Parks............................................................................ 23

            3.    Other works................................................................... 26

III.  ARGUMENT.................................................................................. 29

      A.    A 9-year sentence would fairly balance the wrong that Mr. Huizar has done in this case with his mitigating personal history, lifetime of good works, devotion to family and friends, age, health, and other laudable personal characteristics. .............................................................. 30

i

TABLE OF CONTENTS

PAGE

B.   A 9-year sentence is far more than necessary to prevent recidivism, protect the community, and achieve specific deterrence ............................ 46

C.   A 9-year sentence would avoid unwarranted disparities and similarities .. 50

   1.   A 9-year sentence would more than quadruple the national median and average sentences for first-time offenders in a public-corruption cases, including for nearly-all high-profile public officials who went to trial. ...................................................... 50

   2.   A 9-year sentence would exceed most post-trial outcomes in high-profile corruption cases involving similar sentencing considerations. ................................................................. 51

   3.   A 9-year sentence would avoid unwarranted disparities and similarities among the culpable participants in this case ................ 54

D.   A 9-year sentence is more than sufficient to provide general deterrence, particularly in light of the collateral punishment visited upon Mr. Huizar during this uniquely-public and -personal prosecution. ................................................................. 56

E.   The guidelines – which recommend a multidecade sentence for a nonviolent first-time offender – provide little help in fashioning a parsimonious sentence in this case .................................................... 63

F.   While the effect of Mr. Huizar's conduct damaged the community's trust, that was not his intent; and his overall record, including on development, jobs, and affordable housing, was one of transformative and positive progress ................................................................ 65

G.   A 9-year sentence would promote respect for the law and honor the parsimony principle by sending an appropriately-calibrated message based on all of the circumstances in this case. ........................................... 72

TABLE OF AUTHORITIES

PAGE(S)

**Federal Cases**

Douglas v. Woodford,
  316 F.3d 1079 (9th Cir. 2003) ..................................................... 42

Gall v. United States,
  552 U.S. 38 (2007)................................................... 30, 50, 72, 73

Pepper v. United States,
  562 U.S. 476 (2011)..................................................................... 30

United States v. Adelson,
  441 F.Supp.2d 506 (S.D.N.Y. 2006) .......................... 40, 45, 57, 63

United States v. Apodaca,
  641 F.3d 1077 (9th Cir. 2011) ..................................................... 50

United States v. Autery,
  555 F.3d 864 (9th Cir. 2009) ....................................................... 44

United States v. Baker,
  502 F.3d 465 (6th Cir. 2007) ....................................................... 44

United States v. Bannister,
  786 F.Supp.2d 617 (E.D.N.Y. 2011) ........................................... 48

United States v. Bennett,
  9 F.Supp.2d 513 (E.D. Pa. 1998).................................................. 40

United States v. Carter,
  530 F.3d 565 (7th Cir. 2008) ....................................................... 40

United States v. Carter,
  560 F.3d 1107 (9th Cir. 2009) ..................................................... 42

United States v. Chambers,
  885 F.Supp. 12 (D.D.C. 1995)...................................................... 44

United States v. Edwards,
  595 F.3d 1004 (9th Cir. 2010) ............................................... 45, 46

United States v. Gaind,
  829 F.Supp. 669 (S.D.N.Y. 1993) ............................................... 59

iii

TABLE OF AUTHORITIES

PAGE(S)

United States v. Gupta,
  904 F.Supp.2d 349 (S.D.N.Y. 2012) ...................................................29, 73

United States v. Hack,
  443 F.Appx. 304 (9th Cir. July 18, 2011) .................................................. 65

United States v. Hammond,
  37 F.Supp.2d 204 (E.D.N.Y. 1999) ............................................................ 44

United States v. Haynes,
  557 F.Supp.2d 200 (D. Mass. 2008).....................................................47, 49

United States v. Jaycox,
  962 F.3d 1066 (9th Cir. 2020) .................................................................... 51

United States v. Johnson,
  964 F.2d 124 (2d Cir. 1992) ....................................................................... 49

United States v. Lee,
  725 F.3d 1159 (9th Cir. 2013) .................................................................... 45

United States v. Lehman,
  513 F.3d 805 (8th Cir. 2008) ...................................................................... 44

United States v. Marsh,
  820 F.Supp.2d 320 (S.D.N.Y. 2011) .......................................................... 46

United States v. Nesbeth,
  188 F.Supp.3d 179 (E.D.N.Y. 2016) .......................................................... 59

United States v. Norton,
  218 F.Supp.2d 1014 (E.D. Wis. 2002) ....................................................... 49

United States v. Parris,
  573 F.Supp.2d 744 (E.D.N.Y. 2008) .......................................................... 63

United States v. Prosperi,
  686 F.3d 32 (1st Cir. 2012)......................................................................... 65

United States v. R.V.,
  157 F.Supp.3d 207 (E.D.N.Y., 2016) ......................................................... 44

United States v. Rita,
  551 U.S. 338 (2007)..................................................................................... 40

TABLE OF AUTHORITIES

PAGE(S)

United States v. Rothwell,
   847 F.Supp.2d 1048 (E.D. Tenn. 2012) ..................................................... 2

United States v. Ruiz,
   2006 WL 1311982 (S.D.N.Y. May 10, 2006) ........................................ 47

United States v. Smith,
   683 F.2d 1236 (9th Cir. 1982) .................................................................. 60

United States v. Stern,
   590 F.Supp.2d 945 (N.D. Ohio 2008) ..................................................... 72

United States v. Vigil,
   476 F.Supp.2d 1231 (D.N.M. 2007)........................................................ 59

United States v. White,
   506 F.3d 635 (8th Cir. 2007) ................................................................... 45

United States v. Yeaman,
   248 F.3d 223 (3d Cir. 2001) .................................................................... 56

Wisconsin v. Mitchell,
   508 U.S. 476 (1993)................................................................................. 65

**Federal Statutes, Regulations and Sentencing Guidelines**

18 U.S.C. § 3551................................................................................... 46, 49

18 U.S.C. § 3553....................................................................................passim

TABLE OF EXHIBITS

| Exhibit | Description | Page and line |
|---|---|---|
| Exhibit 1 (Separate Exhibit Table Included) | Sentencing Letters | Passim |
| Exhibit 2 | Jose Huizar Weekly Calendar (January 21, 2018-January 31, 2018) | Page 13, line 22 |
| Exhibit 3 | Weekly Reports (January 19, 2018) | Page 14, line 7 |
| Exhibit 4 | El Sereno Weekly Report (April 24, 2015) | Page 14, line 16 |
| Exhibit 5 | Boyle Heights Weekly Report (December 16, 2016) | Page 14, line 17 |
| Exhibit 6 | Northeast Communities Weekly Report (March 25, 2016) | Page 14, line 17 |
| Exhibit 7 | Article from Los Angeles Magazine entitled "10 Projects that Changed the Face of Downtown L.A. During the 2010s" (December 30, 2019) | Page 16, line 22 |
| Exhibit 8 | Revitalization of DTLA Booklet (appx. 2020) | Page 17, line 4; Page 17, line 16 |
| Exhibit 9 | Article from L.A. Downtown News entitled "A Decade of Bringing Back Broadway" (February 26, 2018) | Page 19, line 8; Page 19, line 10 |
| Exhibit 10 | Homelessness Reduction Booklet (appx. 2020) | Page 21, line 21; Page 21, line 22; Page 21, line 23; Page 22, line 20 |
| Exhibit 11 | Linkage Fee Oversight Committee Report (October 6, 2022) | Page 22, line 11 |
| Exhibit 12 | Press Release Announcing Major Overhaul of Development Process (February 15, 2017) | Page 26, line 13 |

vi

TABLE OF EXHIBITS

| Exhibit 13 | Motion to Prevent Ellis Act Abuse (July 1, 2016) | Page 23, line 4 |
|---|---|---|
| Exhibit 14 | Open-for-Business Motions (June 22, 2016) | Page 29, line 5 |
| Exhibit 15 | Letter from Brandon Fox to Richelle Rios (October 8, 2020) | Page 59, line 4 |
| Exhibit 16 (Separate Exhibit Table Included) | Exhibits Related to Mateo Project (2016-18) | Page 69, line 10 |
| Exhibit 17 | Texts and Calls Relating to Nature and Circumstances of the Offense (2015-2017) | Page 70, line 10 |
| Exhibit 18 | Texts and Calls Relating to Nature and Circumstances of the Offense (August-September 2017) | Page 71, line 14 |



cmjosehuizar • Follow
Los Angeles City Hall

cmjosehuizar Happy 90th Anniversary City Hall! As a Mexican #immigrant, honored to serve in the City of #LosAngeles hallowed halls of government - a building my grandfather, Salvador Huizar, helped to build as a Mexican Laborer. #MexicanAmericanDream #HappyBirthday #CityHall #history #lahistory

Edited - 288w

codisinc
288w   Reply

savantofthespirits Play with your whisky 🏆
288w   Reply

emulsionbakeshop Wow!! That's beautiful! You're grandfather was on to something!! That's definitely the #mexicanamericandream
288w   Reply

nazaria412 Great story @cmjosehuizar ...thanks to your grandfather Salvador Huizar for his contribution in building this magnificent structure ...he would be very proud of your success story in this very building
288w   1 like   Reply

iamgregweaver Hallowed, sir
288w   Reply

chronoshorace Awesome!
288w   1 like   Reply

luna.obsidiana Love this! We need to reclaim the spaces that have been historically denied to us. That we helped build brick by brick. It goes to show that we have just as much of a right to be here as anyone else. 👊
288w   1 like   Reply

altiquity This is really neat
288w   1 like   Reply

364 likes
APRIL 28, 2018

Add a comment...                                                    Post



cmjosehuizar • Follow

cmjosehuizar Happy #FathersDay to all the dads and those serving as father figures. I'm thankful to my dad Simon Huizar for all he did for our family. Lots of sacrifices along the way. It takes a lot to move a family from one country to another. And although he only had a formal education up to third grade, he is still one of the wisest persons I have ever known. His advice and counsel throughout my life will forever be appreciated. #FathersDay2018

280w

frenchyfromfrance Beautifully said! ❤ Happy Father's Day! Blessings to you, to your beloved wife @richelle_huizar and your entire family and loved ones! ❤

280w   1 like   Reply

gloria14g Amen, Mr. Huizar. I'm proud of the example my father has instill in us his children. Happy Father's Day to all the men in our life who take good care of us.

280w   2 likes   Reply

magda2430 Me siento tan pero tan orgullosa de esta generación que lo dio todo, sin miedo, sin prejuicios, sin duda por lograr lo mejor para sus hijos y su futuro. Felicidades por ellos y por usted José Huizar un ejemplo en nuestra comunidad y en el mundo.HAPPY FATHERS DAY!

280w   1 like   Reply   See translation

gazella_13 What a beautiful picture. May God bless him. ❤

280w   1 like   Reply

relautumn Beautiful

280w   1 like   Reply

araceli.go.go.goza Such a wonderful picture 👍

280w   1 like   Reply

huizar.yolanda Happy Fathers day to my father who's in Heaven and I ask for his blessing everyday miss him Beond Words .

280w   2 likes   Reply

358 likes
JUNE 17, 2018

Add a comment...







View of bridge from Mr. Huizar's childhood home





https://www.newspapers.com/image/192780921

Printed on Nov 19, 2023



**FAMILY TIES:** *Jose Huizar is the small boy on the left in this 1971 photo. With him from left: Gloria, Sal, Leo and Yolanda. Behind them are their parents: Isidra, holding Jimmy, and Simon.*

Copyright © 2023 Newspapers.com. All Rights Reserved.















Law School Graduation







CALIFORNIA                                                    LOS ANGELES TIMES



**GROUND BREAKERS:** *Councilman Jose Huizar adjusts a hard hat for Utah Street Elementary student Steven Barragan.*

Photographs by Gary Friedman Los Angeles Times

# New high school a boon for Eastside

The $71.4-million campus, set to open in 2009, will ease crowding at Roosevelt High. It'll have a science emphasis.



**ENTERTAINERS:** *Students from Breed Street Elementary sing during the groundbreaking ceremony for a new high school in Boyle Heights on Wednesday.*

By Amon Green
Times Staff Writer

The Los Angeles Unified School District broke ground Wednesday on a new high school on the Eastside, the first to be built in the area in 85 years.

> 'This is a beautiful example when a community takes leadership in the development of its education.'
>
> **Monica Garcia,** school board member

*—the remaining body text is illegible—*































cmjosehuizar · Follow

cmjosehuizar 389w
The @americanplanningassociation - Los Angeles awarded our @bringingbackbroadway five-year development and successful adoption of the Historic Broadway Sign District with its "Best Practices Award." Congrats to the whole Broadway & #DTLA team! #DTLAFWD

## No comments yet.

Start the conversation.

    

65 likes
June 16, 2016





firefox

https://enewspaper.latimes.com/infinity/article_popover_share.aspx?guid=a4d7f27e-ba4b-41a5-8bd...

# BoomTown L.A.

Downtown area hasn't seen this many big projects since 1920s



A CHINESE firm is erecting the four-tower Metropolis, left, by the 110 Freeway and north of Staples Center. It will have 350 hotel rooms and more than 1,500 condos. (Marcus Yam Los Angeles Times)



cmjosehuizar • Follow

cmjosehuizar Excited to receive the River Champion Award tonight from Community Conservation Solutions. They're bringing #nature to the #river in #studiocity and will soon be planning a natural #park in #boyleheights with residents of #ramonagardens ! #waterfdn #CityofLA #senhertzberg #community

356w

comptonvaquero Congratulations. @cmjosehuizar Well deserved, brother.

356w  Reply

freshprinceofdtla So awesome.

356w  Reply

gabybbi 👏👏👏👏👏🙏👏

356w  Reply

189 likes
February 9, 2017

Add a comment...





cmjosehuizar · Follow

cmjosehuizar So happy to participate in the #Dodger's Dream Field opening at Ramona Gardens with our fantastic partners: the @bgcwsgv ,@dodgersfoundation ,@dodgers ,@majorleaguebaseball , @calripkensrfoundation , @scottslawn , and @mayorofla. Children of Ramona Gardens are so grateful for this major renovation on an old field and it will definitely be put to good use! Thank you all and let's play ball! #derrelthomas #dennispowell

Edited · 350w

fabz_photography_ 💙 🌐
350w  Reply

herokafe Out of This World!
350w  Reply

luckyandrags17 Skate park please & green spaces! People and children of Ramona Gardens deserve it! It's been too damn long!
350w  Reply

moniquespanish 🙏
350w  Reply

p_dub92 Firme. But what's up with that skate park. Been a few years now.
350w  Reply

930 views
March 21, 2017

Add a comment...                    Post





Los Angeles City Councilman Jose Huizar, left, applauds the unveiling of a scale model of a 19-foot monument depicting a Mexican bracero and his family. (Al Seib / Los Angeles Times)















cmjosehuizar · Follow
Los Angeles City Hall

cmjosehuizar It is going to take voters in #LosAngeles to demand we have Statewide action on #homeless housing for those struggling with #mentalhealth issues & #affordablehousing for our #veterans. In November, vote yes on Prop 1 & Prop 2! #YesOnProp1 #YesOnProp2 #EveryoneIn
275w

amplitevc well done!
275w  Reply

86 likes
August 31, 2018

Add a comment...                Post





Case 2:20-cr-00326-JFW   Document 36   Filed 07/30/20   Page 1 of 113   Page ID #:341

FILED
CLERK, U.S. DISTRICT COURT

**7/30/2020**

CENTRAL DISTRICT OF CALIFORNIA
BY: ___ DD ___ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

October 2019 Grand Jury

| UNITED STATES OF AMERICA, | CR 2:20-cr-00326-JFW |
|---|---|
| Plaintiff, | I N D I C T M E N T |
| v. | [18 U.S.C. § 1962(d): Racketeer Influenced and Corrupt Organizations Conspiracy; 18 U.S.C. §§ 1341, 1343, 1346: Honest Services Mail and Wire Fraud; 18 U.S.C. § 1952(a)(3): Interstate and Foreign Travel in Aid of Racketeering; 18 U.S.C. § 666(a)(1)(B): Bribery Concerning Programs Receiving Federal Funds; 18 U.S.C. § 1956(a)(1)(B)(i), (a)(2)(B)(i): Money Laundering; 18 U.S.C. § 1014: False Statements to a Financial Institution; 18 U.S.C. § 1001(a)(2): Making False Statements; 31 U.S.C. § 5324(a)(3): Structuring of Currency Transactions to Evade Reporting Requirements; 26 U.S.C. § 7201: Attempt to Evade and Defeat the Assessment and Payment of Income Tax; 18 U.S.C. §§ 981(a)(1)(C), 982(a)(1), 982(a)(2), and 1963, 26 U.S.C. § 7301, 28 U.S.C. § 2461(c), 31 U.S.C. § 5317: Criminal Forfeiture] |
| JOSE LUIS HUIZAR, | |
| Defendant. | |

1



# Former L.A. Councilmember Jose Huizar pleads guilty in corruption case



Former Los Angeles City Councilmember Jose Huizar, left, arrives at court Friday where he pleaded guilty to a bribery and money laundering scheme. (Irfan Khan/Los Angeles Times)

SUBSCRIBERS ARE READING  >

CALIFORNIA

Everyone in California seems to be sick with respiratory illness. Here's why

FOOD

FOR SUBSCRIBERS

14 classic L.A. hotel bars for out-of-towners and locals alike

FOOD

FOR SUBSCRIBERS

These are the 101 best restaurants in Los Angeles

CALIFORNIA

A surprising new tactic against a reputed Mexican Mafia boss. Will it work?

CLIMATE & ENVIRONMENT

Their land is sinking. But Tulare Lake farm barons defy calls to cut groundwater pumping

ADVERTISEMENT

*And what we students of history always learn is that the human being is a very complicated contraption and that they are not good or bad but are good and bad and the good comes out of the bad and the bad out of the good, and the devil take the hindmost.*

Robert Penn Warren, All the King's Men

# I. **INTRODUCTION**

Rather than subjecting the Court and the city to a drawn-out trial, a coordinated media campaign focused on delegitimizing the judicial process, or years of defiant post-trial litigation, Jose Huizar did what few high-profile officials in his position do: he fully accepted responsibility for his wrongdoing without attempting to point fingers or shift blame, signed an exceptionally-fulsome and -detailed factual basis, and entered into a plea agreement with a binding range of 9-13 years.  He agreed to this resolution – which definitively ends his career and includes a sentencing range starting above the post-trial sentences in most high-profile corruption cases – despite being a first-time offender, a father of four school-aged children, and a once-prominent politician talked about as future Mayor, or beyond.  He also did this despite the deeply personal and public nature of the prosecution, which has cast a near-amnesic pall over every aspect of his life and flattened him into a one-dimensional caricature, knowing that it may leave certain inaccuracies and misperceptions uncorrected.  To say that Mr. Huizar is chastened and remorseful – for committing crimes, for hurting his family, for disappointing his friends and the community, for wasting his potential – would make understatement blush.  He has been publicly pilloried and subjected to the mob.  He has been personally humiliated and destroyed.

In a city of dazzling promise and maddening dysfunction, it is perhaps fitting that Mr. Huizar has repeatedly found himself at the center of civic life.  From immigrant son, to first-generation graduate, to idealistic lawyer representing the working-class district of his childhood, he was once a celebrated leader of unbounded energy and charisma, involved in some of the most pressing issues that the city has faced.  Even apart from the DTLA renaissance, which has been the near-exclusive focus of this case,

1

he boasts an unrivaled record of public achievement, including a history of under-the-radar good works.  At the same time, he is a profoundly flawed man who, rather than exiting public life through the revolving door to private riches, engaged in a pattern of increasingly reckless behavior and abused his office for personal benefit.  Effective leader and convicted racketeer, loving father and an unfaithful husband, Mr. Huizar is a person to whom many confounding descriptions apply – idealist, dealmaker, pro-growth, pro-union, populist, capitalist, alcoholic, hard worker, Angelino, gambler, land-use lawyer – with none being fully sufficient.

In a case like this one, where emotions run high and the public spotlight shines bright, it is easy for simple labels or present appearances to override this nuanced reality.  But the role of a sentencing judge is not to act "as a hooded executioner for an outraged populace."  United States v. Raby, No. CRIM.A. 2:05-CR-0000, 2009 WL 5173964, at *8 (S.D.W. Va. Dec. 30, 2009).  It is to look deeper, and to carefully balance justice with mercy, punishment with rehabilitation, and legal doctrine with compassion and life experience based a more complex truth.

The truth in this case is that Mr. Huizar made grievous errors of judgment, for which he deserves to be punished.  The truth is also that he devoted his life to public service, at great cost to himself and his family, and made significant and often-unseen contributions to the city even as he tarnished his legacy.  The truth is that Mr. Huizar did not set out to break the law, but traveled the arc of idealism to cynicism to illegality through a process of personal weakness and incremental self-justification.  The truth is that, like all of us, like the city of Los Angeles itself, Mr. Huizar is not easily reduceable a single moral label.  Instead, he is a "complicated contraption," with outsized positive and negative characteristics, who has overcome significant hardship and achieved great things, failed in the most public and spectacular way, and accepted responsibility.  Balancing these competing truths is why "[i]t is often said the most difficult task a federal trial judge must perform is deciding upon and then imposing a sentence in a criminal case."  United States v. Rothwell, 847 F.Supp.2d 1048, 1050

1   (E.D. Tenn. 2012).

2          And yet, given the plea in this case, the difficult task is in some ways unusually

3   simple.  § 3553(a)'s overriding command is that any punishment imposed must be

4   sufficient, but not greater than necessary, to achieve the multifaceted purposes of

5   sentencing.  Unless the Court rejects the 11(c)(1)(C), the punishment question thus

6   reduces to the following formulation: taking everything into account, what <u>necessary</u>

7   purpose of sentencing would be served by incarcerating Mr. Huizar for 13 years that

8   would not <u>sufficiently</u> be served by 9?

9          Focusing in on that question gets at the heart of what this sentencing proceeding

10  is really about.  A nine-year prison sentence is <u>not</u> necessary to achieve incapacitation

11  or specific deterrence.  As a 54-year-old first-time offender accused of nonviolent

12  crimes committed in public office, who has performed perfectly on bond for more than

13  three years, Mr. Huizar poses no ongoing threat to society.  A nine-year prison sentence

14  also is <u>not</u> necessary to achieve rehabilitation or contrition.  Mr. Huizar has fully

15  admitted his wrongdoing, signed an expansive factual basis without shifting blame, and

16  agreed to a binding imprisonment range starting at nine years.  A nine-year prison

17  sentence is <u>not</u> necessary to avoid unwarranted disparities and similarities.  Not only do

18  the guidelines in corruption prosecutions commonly yield to other considerations, the

19  11(c)(1)(C) range in this case vastly exceeds national averages and starts above the

20  post-trial outcomes in most high-profile corruption cases nationwide.  Moreover, while

21  the Court has described Mr. Huizar as the most-culpable participant in this case, the

22  range of culpability, and the present need for punishment, is more evenly distributed

23  than the preceding record suggests.  Finally, a nine-year prison sentence is <u>not</u>

24  necessary to achieve revenge.  While there is a legal victim, the victim is a municipal

25  entity that suffered an inchoate loss.  And while Mr. Huizar accepted bribes, he did so

26  in connection with projects that he and others independently supported, which were

27  good for the city, rather than pushing harmful legislation or wasting public funds.

28  Indeed, except for the most biased partisans, nobody would have claimed before the

raids that Mr. Huizar's record of public achievement, including the DTLA renaissance, was anything other than positive.  In fact, the government's own witnesses touted Mr. Huizar's development track record and the virtues of the projects in this case.  In any event, if revenge were the goal, the complete professional, personal, and financial destruction already visited upon Mr. Huizar and his family have achieved it many times over.

At its core, what this sentencing proceeding is really about is the length of time needed to send a fair but sufficiently punishing message – a message from a citizenry that, on both a local and national level, is tired of dysfunction, corruption, backroom deals, moneyed interests, and an amoral political class of which Mr. Huizar has, fairly or not, been posited as the embodiment.  That is not to say that this sentencing is not about the real and specific crimes that Mr. Huizar himself committed.  But an honest accounting requires acknowledging that it will also be permeated by the misdeeds and crimes, past and future, prosecuted and unprosecuted, of many offstage actors.

Whether phrased as general deterrence, retribution, or "promoting respect for the law," the desire to send a message is inarguably a legitimate consideration in a public-corruption sentencing.  But it is also a complicated one because, while the government may suggest otherwise, sending a message with a criminal sentence doesn't necessarily lead in one direction.  For example, what message does it send if a person fully accepts fault without shifting blame, signs an extensive factual basis, and foregoes a trial and post-trial litigation, but still gets a longer sentence than the worst offenders who never admit fault through trial and appeal?  What evidence is there that the length of a prison sentence in this case, as opposed to the certainty of detection and prosecution, will have any impact on future officials at all?  What amount of additional punishment can justly be imposed on one person as an instrument to deter another – or to express anger at the many wrongdoers not prosecuted?

Maybe most importantly: what necessary message would not be sent by a 9-year sentence that would be sent by 13?  After all, the range in the (c)(1)(C) is not tied to the

4

guidelines, and it far exceeds the typical public corruption sentence even in cases that go to trial. If the point of the message is that public officials who breach the community's trust will be humiliated, lose everything, and receive substantial prison terms, even on a first offense, one would be hard-pressed to explain why nothing less than 13 years – a number plucked from the air by the parties – will possibly do. Indeed, if 13 years is necessary, why is 13 years and one day not?

In short, while sending a message and deterring others are legitimate goals, they are unquantifiable ones bounded by moral and practical limits. People are not stock characters or vessels through which to transmit vague warnings to the public. And hanging one man for the sins of another does as much to promote derision for the law as it does respect. Five years from now, the only people who will remember whether Mr. Huizar got 9, 10, or 13 years will be the parties and his family, the latter of whom will grow up, grow old, and die in his absence. For everyone else, specific memories will fade, and even with a 9-year sentence, the lasting message will be that Mr. Huizar confessed and received a lengthy term in prison.

To be clear: everyone agrees that Mr. Huizar's conduct warrants a significant custodial term. The question today is whether wisdom, justice, mercy, and common sense require a sentence beyond 9 years. Given the unique circumstances of this case – including Mr. Huizar's complete acceptance of responsibility, mitigating personal history, nonexistent recidivism risk, positive record of public service, family ties and responsibilities, significant collateral punishment, and the need to avoid unwarranted disparities and similarities – the answer is no. A 9-year prison sentence would be sufficient, but not greater than necessary, to achieve <u>all</u> of the multifaceted purposes of sentencing. More than that, it would reflect a system of justice capable of nuance, pragmatism, and redemption, which ultimately promotes respect for the law more than unmitigated harshness or an overreliance on emotion or guidelines arithmetic.

///

///

5

# II. <u>BACKGROUND</u>

**A. Born into poverty in rural Mexico, Mr. Huizar's childhood instilled in him the values of hard work, education, service, social justice, and a commitment to bettering himself and the lives of others.**

Somewhat poetically, Mr. Huizar's Los Angeles story begins and ends in roughly the same place.  In the 1920s, his paternal grandfather was one of many Mexican laborers temporarily admitted to the United States to help construct Los Angeles City Hall.  Working with mules, he helped to excavate the site and construct the building's base.  After completing his work, he returned home, eventually had 10 sons, and, 40 years later, one of those sons had a son named Jose Huizar.

At the time of his birth, Mr. Huizar's parents lived in an adobe home in Los Morales, a rural town in the central Mexican state of Zacatecas.  Comprised largely of ranchos without paved roads or running water, Los Morales was agrarian and poor.  For many years, Mr. Huizar's father, like his own father, like 8 of his 10 brothers, traveled seasonally to the U.S. to work in the fields as part of the Bracero program.  Eventually, when Mr. Huizar was three, his parents sought a better life for their children by moving permanently to the United States.

After relocating from Los Morales to unincorporated East L.A. – now across the river from City Hall – the family initially lived in Mr. Huizar's uncle's home with 20 people.  While neither of Mr. Huizar's parents attended school past the third grade, they were stubbornly proud and unwilling to accept government assistance.  They got jobs shortly after arriving in Los Angeles, later joined labor unions, and eventually bought a modest home of their own in Boyle Heights.  Before his death from alcohol-induced liver cancer, Mr. Huizar's father, Simon, worked as a machine operator.  His mother, Isidra, worked in a meatpacking plant in a formerly-industrial part of DTLA.  As Mr. Huizar's sister recalls of this time:

> Our house was tiny, and we ate almost the same food each day, my father did most of the grocery shopping and cooking.  He made sure there was always a 5 lb bag of beans and rice in the kitchen.  Our parents earned minimum wage and somehow raised 6 children. I witness my parents always working, in very difficult back breaking, labor intense jobs.  They would leave for work very early and did not see us in the morning.

6

Ex. 1-4 [Gloria Galvan].

Mr. Huizar's childhood instilled in him the values of hard work, solidarity, education, resourcefulness, and self-improvement. From a young age, he and his siblings were expected not only to attend school, but to work and contribute to the family. As a boy, he shined shoes and collected bottles and cans that he turned in for money. Later, he got a job delivering newspapers. Over the summers, he and his siblings traveled to Orange County to pick strawberries and other fruit. See Ex. 1-4 [Gloria Galvan]; Ex. 1-5 [Yolanda Huizar].

Largely of necessity – because neither of his parents spoke English – Mr. Huizar navigated many aspects of life on his own. A lifelong baseball lover, he signed himself up to play in a local league when he was eight. At 11 and 12, he ran for class President, crafting a campaign, creating flyers, and marshaling support without assistance.

Despite his evident promise, however, Mr. Huizar grew up in a neighborhood teeming with negative influences and potential pitfalls. As Mr. Huizar's sister recalls: "[O]ur home [wa]s located across the street from the 4th street bridge," a location known then as The Hole, "that [wa]s surrounded by different gangs. There were always gang fights, drug sales and drug users in our neighborhood." Ex. 1-4 [Gloria Galvan]. Mr. Huizar was constantly pushed to join a gang and use drugs at a very early age, but he declined. Unable to completely avoid the pitfalls of his environment, however, he was expelled from Stevenson Junior High in seventh grade.

While that setback could have sent Mr. Huizar down a starkly different path, as at other times in his life, he responded productively and found redemption through hard work and education. After leaving Stevenson, he started at Hollenback, where he tested into honors classes. While there, for the first time, a counselor suggested that he may be a candidate for college.

Had Mr. Huizar remained in public school, however, he would have matriculated to Roosevelt High School, which was overcrowded and plagued by the same problems

7

as those afflicting the community.  Motivated by the prospect of higher education, Mr. Huizar instead applied to Salesian High School, got admitted on his own, and, over the next four years, worked to pay for his education.  As recalled by Masamichi Kiyomiya, in whose Little Tokyo store Mr. Huizar worked during this time:

> Jose worked after school every day and weekend for a little over 4 years.  I allowed him to study at shop any time when we did not have any customers.  We talked about many thing that happened at school including his scores of tests and soon we set up a rule between us.  He get a dollar when he get A on test and A on report card for more money.  Toward the end of his high school year, it may be less than a year, we started to exchange opinions about his future career and what to study at university.  He wanted to major business but I want him to go for politics.  Sometime we escalated to argue each other over this issue but eventually he understood politic is much bigger world and complicated.  Especially he seemed to like the idea that politics can change communities for better place and lives.  He start having many imaginations what he could do.  Such as making East L.A to East Beverly Hills was big topics within us.

Ex. 1-25.

During his time at Salesian, Mr. Huizar excelled academically, emerged as a leader, and developed important, lifelong relationships.  Father Nieblas, who later officiated Mr. Huizar's wedding and baptized his children, served as a guide and mentor, helping Mr. Huizar navigate his teenage years and, at times, providing him with financial assistance out of his personal funds.  As recounted by Father Cotter, another of Mr. Huizar's teachers at the school:

> In class, Jose was a wonderful student, always eager to learn and to do his best.  Outside of the classroom, Jose always showed leadership amongst his classmates and was kind, considerate and thoughtful.
>
> He was chosen to go on a Kairos Leadership Retreat weekend because of his leadership qualities and good moral character.  He represented our school well and we were always proud of him.  He came from a wonderful family and they were solid Catholic Christians, active in their faith and expressive of their strong social justice concerns.

Ex. 1-33.

**B. The first in his family to go to college, Mr. Huizar attended U.C. Berkeley, where he emerged as a leader in student government, Princeton, where he studied public policy and planning with an analytical focus, and UCLA Law, where he concentrated on public-interest, real estate, and environmental law, all of which would later coalesce during his tenures in LAUSD and Council.**

At Father Nieblas's urging, Mr. Huizar applied to U.C. Berkeley and, somewhat

8

to his surprise, got in.  The first in his large family to attend college, he was initially shocked by the scale and diversity of the school, and overwhelmed with responsibility. Quickly, however, he integrated into the community, joined student government, and became active in political causes ranging from South African divestment to student healthcare and ethnic studies.  <u>See</u> Ex. 1-35 [Mark Raffield ("I was awed by how quickly Jose took on a leadership role at UC Berkeley.  By sophomore year, he was one of the 12-member UC Berkeley's student government association and became a visible leader on campus.  He was passionate about affordability of education and providing academic services to low-income students.")].

With no financial support from his family, Mr. Huizar funded his education and living expenses through loans and scholarships, and by doing data entry jobs, research studies, and working the graveyard shift at UPS.  As recalled by Algernol Boozer, one of Mr. Huizar's fraternity brothers at Cal:

> One poignant memory that stands out is an early morning we returned from our physically demanding jobs at UPS. Mr. Huizar, clad in work boots, spoke proudly about the hard work and how it would have made his father proud.  This moment revealed his dedication and work ethic, traits that have undoubtedly contributed to his academic achievements and commitment to community service.

Ex. 1-27.

At times during this case, Mr. Huizar has been cast as a planning and policy dilettante focused only on the ill-gotten spoils of his office – an accusation lobbed most frequently, and most sardonically, by George Esparza.  The reality is much different. After graduating from Cal, Mr. Huizar won a Ford Foundation fellowship to obtain a Masters in public policy from Princeton, where he explored a personal interest in policy and planning with a focus on economic and statistical analysis.  Intent on translating his education into the real world, between his first and second years in the program, Mr. Huizar also worked for a year in the California state legislature.

After completing his masters, Mr. Huizar returned to L.A. and enrolled at UCLA School of Law.  Living in the basement of his mother's home in Boyle Heights, he took

9

courses focused on his disparate interests of real-estate, environmental, and public-interest law.  As at Cal, he financed his education through side jobs and student loans, which he was still repaying until the final balance was discharged in 2022.  Along with obtaining his law degree, Mr. Huizar also met his wife, Richelle, an aspiring social-justice lawyer focused on children's rights.

Upon graduation, Mr. Huizar hoped to work as a public-interest lawyer serving the Boyle Heights community.  But when that time came, he was newly married, deeply in debt, and in need of money.  For roughly five years, he worked at law firms as a real-estate and environmental lawyer, while also taking on pro bono matters when he could.  During this time, while volunteering for a local organization responding to a proposed Metro project, Mr. Huizar was recruited by former Mayor Riordan to run for a LAUSD Board seat and help with the construction of schools in a badly-overcrowded district.

**C. Mr. Huizar enters public life as a Board Member, then President, of LAUSD, where his success leads to his election as the Councilmember for CD-14.**

Mr. Huizar began his public life when he was elected to the Los Angeles Unified School District Board in 2001.  Given the importance that education played in uplifting his own life, it is no surprise that Mr. Huizar committed himself to the role with zeal.  Though his work spanned many issues, helping to resolve the chronic shortage of schools was Mr. Huizar's crowning achievement.  School overcrowding had become an epidemic in Los Angeles.  Thousands of children were bused for hours to far-flung campuses that had space, and many schools instituted year-round schedules in a desperate attempt to alleviate the overcrowding.  The issue also had personal resonance for Mr. Huizar, as his neighborhood high school in Boyle Heights, Roosevelt, was infamous for its overcrowding, leading to unacceptably high levels of student dropouts.

During Mr. Huizar's tenure, the school district launched a $14 billion campaign

10

to alleviate the overcrowding.[1]  As a result of this massive investment, 131 new schools were built and 65 campuses were expanded, adding 170,000 new seats for students.[2]  Mr. Huizar played an instrumental role in this plan, cutting through structural barriers to development through aggressive negotiation and eminent domain to ensure the single largest public education expansion in American history.  Indeed, former school board member Monica Garcia described Mr. Huizar as a leader "of the largest public works program that built 131 new schools in LA." Ex. 1-7.  This achievement "ended forced busing and the academically inferior concept 6 calendar, which offered students 163 days of instruction instead of 180."  Id.  After decades of no growth that had harmed the education of the poorest students in the community, Mr. Huizar was able to solve these intractable problems and build schools.

Mr. Huizar also worked to improve the quality of education offered at LAUSD beyond removing the need for the year-round schedule.  When he arrived at the school board, many LAUSD schools failed to offer a curriculum that would allow students to matriculate at the Cal State or UC system.  Instead, many students – primarily students of color in schools like Roosevelt – were shunted into replacement-level courses that inhibited their ability to go to college.[3]  As board president, Mr. Huizar championed a proposal to require that all students be offered the necessary college preparatory courses.  While facing criticism that the move would challenge students in certain schools beyond their capabilities, Mr. Huizar insisted that all students, not merely the wealthier ones, have the opportunity to succeed.  In Ms. Garcia's telling, Mr. Huizar "was a leader in the movement to create access to college going curriculum, removing institutional barriers that discriminated against children attending underserved schools

---

[1] Cara Mia Dimassa, An Education in Expansion, L.A. TIMES, Nov. 23, 2004, https://www.latimes.com/archives/la-xpm-2004-nov-23-me-building23-story.html.
[2] Howard Blume, Q&A: The huge L.A. school construction project is done, so what does it add up to?, LOS ANGELES TIMES, Aug. 21, 2017, https://www.latimes.com/local/california/la-me-edu-la-school-construction-numbers-20170821-htmlstory.html.
[3] Maria Jose Sullivan, LAUSD school board approves new college track requirements, Daily Sundial, June 27, 2005, https://sundial.csun.edu/9021/archive/lausdschoolboardapprovesnewcollegetrackrequirements/.

in high need communities." Ex. 1-7.

By 2005, key political figures in the city had begun recognizing Mr. Huizar's positive work in the community. After Antonio Villaraigosa was elected mayor in May 2005, thereby vacating his council seat in CD-14, he endorsed Mr. Huizar to replace him for the remainder of his term.[4] Indeed, Mr. Huizar's work on the school board inspired nearly the entire council, the Los Angeles Times, and other luminaries of east Los Angeles politics to endorse him.[5] Mr. Huizar's record was so strong that he defeated a former councilmember for CD-14.

**D. Mr. Huizar spends 15 Years on the Council working to help his constituents throughout his district with issues large and small.**

It is impossible to comprehensively describe the work Mr. Huizar did on behalf of both CD-14 and the city as a whole during his nearly fifteen years on the council within the pages of a sentencing memorandum. But a summary of the breadth and diversity of his work is necessary to provide the Court with an accurate understanding of the public servant, though flawed as he became, that Mr. Huizar was. This case has focused almost exclusively on four development projects downtown in a four-year period. However, downtown revitalization represented only one of the many initiatives Mr. Huizar championed, albeit one that garnered substantial press attention. And even the portion which became the nucleus of this case is a sliver of the overall downtown development taking place between 2012 and 2020.

At the time of his election, CD-14 was a very different district than the one during the time of the offense conduct. It was primarily comprised of east Los Angeles, including Highland Park, Eagle Rock, and Boyle Heights. Hence, it was not until 2012, midway through his time on the council, that Mr. Huizar's district encompassed downtown and the development that entailed. By that point, Mr. Huizar

---

[4] Steve Hymon, <u>Villaraigosa Backs Huizar for Council</u>, L.A. TIMES, Aug. 2, 2005, https://www.latimes.com/archives/la-xpm-2005-aug-02-me-huizar2-story.html.
[5] Editorial Board, <u>For City Council</u>, LOS ANGELES TIMES, Oct. 21, 2005, https://www.latimes.com/archives/la-xpm-2005-oct-21-ed-council21-story.html.

had already been reelected twice in 2007 and 2011, reflecting his popularity and success in working on behalf of his constituents.  By 2015, the year of his final reelection, Mr. Huizar was well-loved in the community for his work, including, but not limited to, downtown.  He was endorsed by a paper covering downtown, which cited his "worthy gains," including his stewardship of downtown's boom.[6]  And the Los Angeles Times recognized that Mr. Huizar was popular throughout his district based on the sorts of bread-and-butter councilmember work that he was highly effective at.[7]  Diverse groups like other members of the council, firefighters, and hotel workers all combined to catapult Mr. Huizar to a double-digit victory over his opponent, a veteran of eastside politics.

The reason is clear.  Throughout these years, Mr. Huizar dealt with countless issues, both grand and parochial, to improve the city.  And his day-to-day work reflects those priorities.  Almost every minute of Mr. Huizar's time was scheduled to various causes and goals.  Take, for example, a calendar covering January 22 to January 31, 2018, during the heart of the time of the offense conduct. Over the course of days routinely lasting twelve or more hours, Mr. Huizar: attended council and committee meetings, discussed potential legislation relating to short term rentals, had breakfast meetings with other politicians, prepared for and attended the Night on Broadway event, met with staff to discuss the Sixth Street Bridge project, attended a meeting to address homelessness, met with developers seeking to build in his district, met with the municipal employee labor union AFSCME, met with a Girl Scout troop, held a press conference to reassure the community about a rash of church fires, and so on.  Ex. 2. Downtown development mattered, of course, but it was only one piece of the overall puzzle.  Simply put, Mr. Huizar's days were bursting at the seams with the work of a

---

[6] Editorials, Endorsement: Jose Huizar for City Council, L.A. DOWNTOWN NEWS, Feb. 16, 2015, https://www.ladowntownnews.com/opinion/endorsement-jos-huizar-for-city-council/article_da74eb9c-b3d4-11e4-b86a-87c7966c5479.html.

[7] David Zahniser, First & Spring: Why the gap between Huizar and Molina became a canyon, L.A. TIMES, Mar. 8, 2015, https://www.latimes.com/local/cityhall/la-me-analysis-huizar-victory-20150309-story.html.

1    committed public servant handling all matter of issues beyond development.

2         Mr. Huizar's attention was therefore split between the various segments of his

3    district, not simply downtown.  Through staff reports, Mr. Huizar kept abreast of, and

4    took steps to resolve, issues affecting his constituents.  Each week, Mr. Huizar received

5    staff reports covering Boyle Heights, Downtown, Northeast (*i.e.*, Eagle Rock, Highland

6    Park, etc.), planning projects, public works, and various constituent issues and

7    meetings.  See, e.g., Ex. 3.  Rather than relate to massive skyscrapers in a single corner

8    of downtown, the overwhelming bulk of the reports address the everyday sorts of issues

9    politicians solve.   For example, in a single week in January 2018, Mr. Huizar's office

10   supported the building of a bracero statue on Spring/Cesar Chavez, interfaced with

11   parking enforcement downtown to make it safer for bicyclists dealing with illegally

12   parked cars, sponsored a blanket drive for the unhoused in Northeast, pushed for

13   graffiti abatement in El Sereno, and tracked planning projects throughout the city.  A

14   similar description could be given for each and every of the hundreds of weeks Mr.

15   Huizar was in office.  Whether it was dealing with a hole in the roof of a seniors center

16   in El Sereno, Ex. 4, pushing for a cleanup of the Exide toxic lead site near Boyle

17   Heights, Ex. 5, or attending an Eagle Rock Chamber of Commerce mixer, Ex. 6, Mr.

18   Huizar's time and focus was spread widely, with only a minority of it focused on

19   downtown development.

20        Even though this work garnered fewer splashy headlines, it made a world of

21   difference to the Angelenos who needed it.  Margarita Amador is one of them.  As a

22   lifetime resident of Boyle Heights, she is undoubtedly accustomed to her neighborhood

23   receiving the least attention and the fewest resources.  But as she writes in her letter,

24   Mr. Huizar got results for Boyle Heights.  He found funds to build a gym, fixed

25   basketball courts, lobbied the Los Angeles Dodgers to improve the local baseball field,

26   and even built a new crossing light needed to protect children.  Ex. 1-9.  In Ms.

27   Amador's words: "[o]ur mothers asked for this, and he delivered."  Id.  John Goldfarb

28   is another Angeleno whose life was bettered by Mr. Huizar's work.  As he describes,

                                            14

Mr. Huizar fixed Colorado Boulevard to add bike lanes, secured funding for a new park on York Boulevard, created an off-leash dog park, and sponsored food giveaways among other things.  Ex. 1-16.

* * *

As described in numerous other letters referenced in Section III.A., the same story holds true for other neighborhoods in Mr. Huizar's district, from El Sereno, to Highland Park, to DTLA.  There are tens of thousands of people like Ms. Amador and Mr. Goldfarb whose lives were enriched by the work Mr. Huizar did.   While this case will undoubtedly be the legacy of his public life, it is not the sum of his work in politics, and the Court should consider Mr. Huizar the politician holistically in fashioning the appropriate sentence.

**E. Mr. Huizar embraced a nuanced development policy oriented toward serving the local community.**

Mr. Huizar had a simple policy when it came to development: build projects that would benefit the city in places where the community was in support.  In a district that personified the contrast at the heart of Los Angeles – billion dollar towers a stone's throw from some of the city's poorest neighborhoods – that policy necessarily led to a nuanced approach.  The inevitable result of the narrow context of this case is an inference that Mr. Huizar was irredeemably corrupt, always on the side of developers willing to pay, to the detriment of honest citizens.  But that caricature of Mr. Huizar ignores his actual approach to development throughout his large, diverse district.  On the one hand, Mr. Huizar is rightfully celebrated for overseeing the renaissance of downtown Los Angeles which resulted in thousands of additional housing units in a city in desperate need of more.  But that same Mr. Huizar fought to protect his poorer constituents in Boyle Heights and El Sereno, supporting rent control in the former and preventing the development of treasured open space in the latter.  Mr. Huizar accepted benefits from developers who wanted to build developments that were good for the city, and, in this case, he did so in a criminal way.  But at the same time, he jealously

15

guarded the interests of his constituents in the poorer parts of his district.

### 1. Downtown

a. <u>Mr. Huizar sought to make a Downtown Los Angeles befitting a world-class city.</u>

The core mantra of Mr. Huizar's approach to downtown was simple: every great city needs a great downtown.  As anyone living here for longer than a decade can attest to, Los Angeles did not have a great downtown at the turn of the millennium.  Competing business districts in Century City, Santa Monica, and elsewhere had robbed downtown of its vitality.  The more middle-class portions of downtown had turned to outright blight in places.  The opening of the South Park Ralphs in 2007 represented the only supermarket downtown for years.  Even the Los Angeles convention center, which should have been a draw, was dilapidated and losing out on hosting conventions to much smaller cities.  By the time Mr. Huizar left office, downtown looked dramatically different and for the better.

As the councilmember for CD-14 and the chair of PLUM, Mr. Huizar bore primary responsibility for guiding development in downtown Los Angeles. Combining his experience as a land-use attorney with his skill at resolving public policy problems, Mr. Huizar fostered an unparalleled revitalization downtown.  What had been a sleepy, 9-to-5 neighborhood abandoned on the weekends transformed over the course of the 2010s, at a time when the city needed badly to recover from a recent financial crisis. Billions in investment caused downtown to "emerge[] as a vibrant destination replete with residential projects, new restaurants, and cultural destinations."  Ex. 7.  The population of downtown surged; by 2017, the number of residents had tripled from 1999, reaching 60,000 people.[8]  But beyond simple census data, downtown Los Angeles emerged as a major cultural destination in its own right during this period.

---

[8] Scott Beyer, <u>Downtown Los Angeles Is America's Most Colorful Neighborhood</u>, FORBES, Apr. 28, 2017, https://www.forbes.com/sites/scottbeyer/2017/04/28/downtown-los-angeles-is-americas-most-colorful-neighborhood/?sh=67180e62887b.

16

1    New institutions like the Broad, the Wilshire Grand Hotel, and even the First Street

2    Courthouse opened during Mr. Huizar's time at CD-14.  The Arts District exploded

3    with some of the city's best-known restaurants.  Over a thousand restaurants, bars,

4    retail shops, and other amenities opened downtown between 2008 and 2018.  Ex. 8 at 5.

5    It is little surprise that GQ Magazine called downtown Los Angeles "America's Next

6    Great City."  Put simply, over the course of Mr. Huizar's eight years as downtown's

7    councilmember, it had radically changed for the better.

8                    b.  Mr. Huizar sought to build tens of thousands of homes in DTLA.

9          Downtown Los Angeles was a natural place to start building the many homes the

10   city desperately needs.  After the flight from the urban core in the late twentieth

11   century, downtown Los Angeles was left with only 10,000 homes within its borders.[9]

12   But as the councilmember for downtown, Mr. Huizar helped shepherd through the

13   largest construction boom downtown had seen since the 1920s.[10]  Indeed, between 2013

14   and 2022, Los Angeles was second in the nation for new apartments built downtown,

15   representing nearly half of all apartments built in the entire city during that period.[11]  In

16   2019, 3600 residential units broke ground with another 35,000 proposed. Ex. 8 at 8.

17                    c.  Building DTLA served the interests of the city as a whole.

18         Mr. Huizar's approach of treating downtown as the economic engine of the city

19   redounded to the benefit of all.  There was, of course, a generalized benefit by

20   providing Angelenos with a downtown they could be proud of.  But there were also

21   significant tangible economic benefits.  The billions spent downtown flowed back out

22   in the form of tens of thousands of high-paying construction jobs and all manner of

---

[9] Kat Hanna & Andrew Altman, The reimagination of downtown Los Angeles, BROOKINGS INSTITUTE, July 8, 2016, https://www.brookings.edu/articles/the-reimagination-of-downtown-los-angeles/.

[10] Andrew Khouri, Downtown Los Angeles hasn't seen this much construction since the 1920s, LOS ANGELES TIMES, Jan. 8, 2017, https://www.latimes.com/business/la-fi-downtown-boom-20161130-story.html.

[11] Steven Sharp, Study: DTLA ranked second in the country for apartment construction in the past decade, URBANIZE LOS ANGELES, Sept. 15, 2023, https://la.urbanize.city/post/study-dtla-ranked-second-country-apartment-construction-past-decade.

17

knock-on spending in the city. Developers moreover paid hundreds of millions back to the city through linkage fees and TFAR payments which were used to support affordable housing and public initiatives, respectively. In contrast, not building serves no one. Failing to replace, for example, one of the many drab parking lots in South Park with a largescale mixed-use building robs the city of housing, hotel rooms, restaurants, and stores.[12] But it also stops the creation of thousands of good, well-paying jobs to build, millions in TFAR payments, and ongoing tax revenues generated by the businesses. Hence, by successfully shepherded these projects through Los Angeles' byzantine and arcane development processes, Mr. Huizar significantly contributed to the city's growth and betterment.

> d. Mr. Huizar sought to improve DTLA through means besides major development.

While massive project development has been the focus of this case, it reflects only a small portion of Mr. Huizar's overall work downtown. Among his proudest achievements was the creation of the Bringing Back Broadway initiative, which aimed to revitalize the historic Broadway corridor in downtown Los Angeles. The Broadway corridor, which at one point in the 20th century boasted the most theaters in the world and high-end shopping, had fallen into blight in the 1980s as residents moved out of the city center. In furtherance of his animating belief – that every great city needs a great downtown – Mr. Huizar worked to breathe new life back onto Broadway.

In what would has proven to be the recurring challenge in Mr. Huizar's professional career, his mission to fix Broadway required cutting through antiquated and contradictory codes that made it too cumbersome to make productive use of nearly a million square feet of space lining Broadway.[13] Through his work with Bringing

---

[12] Indeed, this scenario describes the billion-dollar Metropolis complex at 8th and Francisco Streets, which employed 15,000 workers to replace parking lots with 1,500 condominiums, a 350-room hotel, and 70,000 square feet of commercial space.

[13] Roger Vincent, L.A.'s Broadway showing signs of reawakening, LOS ANGELES TIMES, Feb. 6, 2014, https://www.latimes.com/business/la-fi-property-report-20140206-story.html.

Back Broadway, Mr. Huizar shepherded through new guidelines that would allow for seamless transformation of the empty spaces.

The fruits of this work are self-evident to anyone comparing the Broadway of 2008 and the Broadway of today. As one downtown-focused publication described:

> The changes are obvious, and benefit those who live, work in or visit Downtown. Most notable is the influx of new businesses, highlighted by the Ace Hotel, which arrived in 2013 and served as a catalyst for the corner of Ninth and Broadway. A collection of high-end retail spots followed, and in addition to drawing hotel guests, locals frequent the Ace for the concerts and events in its refurbished theater.

Ex. 9.  Moreover, "[c]redit for the turnaround goes to the office of 14th District City Councilman Jose Huizar, who a decade ago launched the Bringing Back Broadway initiative."  Id.

Night on Broadway, Mr. Huizar's event celebrating the historic thoroughfare, was also one of the city's premiere cultural events.  In conjunction with the revitalization of the historic theaters lining Broadway, Mr. Huizar designed the Night on Broadway festival as a "love letter" to Los Angeles.  The annual event brought hundreds of thousands of people to Broadway, which was limited to pedestrians to enjoy live music, visit the theaters, and experience downtown in a way that was unthinkable only a few years before.  The event, which successfully ran for years, demonstrated that downtown had its own cultural vitality and could contribute to the city as a destination.

Mr. Huizar similarly worked to improve Pershing Square, the longstanding core of downtown that had fallen into disrepair over the decades.  The construction of the underground Pershing Square parking lot raised the level of the park itself, functionally separating it from the streets, a problem only exacerbated by a 1990s redesign that turned the space into a maze.  Mr. Huizar therefore held a design contest in 2015 for plans to overhaul the square.[14]  Mr. Huizar moreover was instrumental in ensuring

---

[14] Christian Martinez, Overhaul of Pershing Square, long a 'concrete jungle' in downtown L.A., finally breaks ground,  LOS ANGELES TIMES, Sept. 1, 2023,

19

1   funding for the program, through his revitalization of Quimby fees, see infra, and

2   TFAR contributions.  While construction was held up following the selection of the

3   plan, the city finally began to break ground this year and will change Pershing Square

4   into greener, more accessible park that Angelenos can be proud of.

5         **2.  East and Northeast Los Angeles.**

6         Of course, Mr. Huizar represented more than downtown.  His constituents in El

7   Sereno and Boyle Heights had markedly different priorities, which Mr. Huizar duly

8   protected.  The residents of these neighborhoods rightfully feared gentrification and

9   losing their homes.  In contrast to his approach downtown, Mr. Huizar worked to

10  ensure that his constituents in east Los Angeles were not victimized by predatory

11  development that did not serve their interests.

12        Mr. Huizar's approach to the Elephant Hill open space in El Sereno exemplifies

13  how he was no mere shill for development for development's sake.  Elephant Hill, one

14  of the largest remaining open spaces close to downtown, was a natural target for

15  developers.  A Newport Beach-based developer purchased the plot in 2003 and sought

16  to construct a new subdivision, which the City Council had approved prior to Mr.

17  Huizar's election in 2005.[15]  But after he reached the council, Mr. Huizar became a

18  fierce advocate against the development, even though the developer's lobbyist had held

19  multiple campaign fundraisers for Mr. Huizar.[16]  As part of the council, Mr. Huizar

20  reversed the Board of Public Works' approval of permits necessary to begin

21  construction.[17]  Mr. Huizar continued his opposition to the development until

22  orchestrating the city's decision to purchase the property and use it as a park, thereby

23

24  https://www.latimes.com/california/story/2023-09-01/downtown-los-angeles-pershing-square-renovation-work-begins.

25  [15] Louis Sahagun, El Sereno saves the Heavens, LOS ANGELES TIMES, Nov. 10, 2009, https://www.latimes.com/local/la-me-outthere10-2009nov10-story.html.

26  [16] David Zahniser, L.A. council to settle lawsuit by buying El Sereno property for

27  use as a park, LOS ANGELES TIMES, Nov. 4, 2009, https://www.latimes.com/archives/la-xpm-2009-nov-04-me-park4-story.html.

28  [17] Staff and Wire Reports, City denies permit for Elephant Hill developer, LOS ANGELES TIMES, Oct. 25, 2007, https://www.latimes.com/archives/la-xpm-2007-oct-25-me-briefs25.s1-story.html.

maintaining the space in perpetuity.[18]  As described by a community organization opposed to the development, Mr. Huizar provided "steadfast leadership as he champion[ed] residents' public safety and environmental concerns related to this development."[19]

**F.  Mr. Huizar's major policy initiatives bettered the city for all.**

As described above, it is impossible to fully catalog Mr. Huizar's priorities and achievements. But as the it fashions the appropriate sentence, Mr. Huizar asks the Court to consider certain initiatives in which Mr. Huizar takes particular pride.

**1.  Homelessness.**

Homelessness has proven to be the city's defining and most intractable problem for years.  To say that Mr. Huizar placed special focus while on council to combat homelessness is not to say that it has been solved.  It is readily apparent that it has not been.  But Mr. Huizar was a committed advocate at council for trying to address this issue, when many others would prefer to simply ignore it so long as it stayed out of their district.  The downtown development described <u>supra</u> played a role in that by building thousands of new housing units in a city that barely builds anymore.  But Mr. Huizar also took other significant actions to try to solve an issue that challenges the city to this day.

First, Mr. Huizar gave the issue special focus at council by spearheading the creation of the city's first Homelessness and Poverty Committee, of which Mr. Huizar served as the first chair.  Ex. 10.  Working through that committee, Mr. Huizar issued the city's first Comprehensive Homelessness Strategic Plan in 2016.  <u>Id.</u>  Mr. Huizar also successfully passed a motion to create the city's first Homelessness City Coordinator.  <u>Id.</u> at 6.

---

[18] Zahniser, <u>supra.</u>

[19] Damien Newton, <u>City Council Agrees to Buy Elephant Hill from Developer and Preserve It As Open Space</u>, Nov. 4, 2009, STREETS BLOG LA, https://la.streets blog.org/2009/11/04/city-council-agrees-to-buy-elephant-hill-from-developer-and-preserve-it-as-open-space.

Second, Mr. Huizar championed the passage of Los Angeles's linkage fee to generate badly needed funds for the city's affordable housing trust in 2017. The city's affordable housing trust, which it used to support the development of affordable homes, had shrunk from $100 million in 2010 to nearly empty in 2017 due to the lack of a city-based funding source and the end of federal and state contributions. Seeking to create a new source of funding for the trust, Mr. Huizar pushed to add a fee that charged developers on a square-foot basis for new buildings. He managed to do so even over the opposition of the business community in 2017, which argued that the fee would discourage development.[20] Now in effect, the linkage fee generates tens of millions of dollars annually that supports affordable housing. Ex. 11.

Third, Mr. Huizar co-authored Measure HHH, a bond proposition to raise $1.2 billion to build supportive housing for homeless residents of the city. Mr. Huizar moreover led the way at council in implementing Measure HHH by approving significantly more sites in his district for building than his colleagues.[21] These funds represent the largest infusion of homelessness-directed investment in the city's history.

Finally, with Mr. Huizar's assistance, his district saw the greatest number of affordable housing units constructed during his tenure as compared to all the other Council Districts, thereby preventing at-risk residents from becoming homeless. Moreover, in Boyle Heights, nearly two thirds of the residents were renters subject to a rent stabilization ordinance. Ex. 10 at 21. But many of residents did not understand their rights, which left them vulnerable to predatory landlords and the possibility of unfair evictions.[22] Hence, Mr. Huizar launched an outreach program to address this

---

[20] Craig Clough, LA's $100 million affordable-housing 'linkage fee' could pass City Council, CITY NEWS SERVICE, Dec. 13, 2017, https://www.dailybreeze.com/2017/12/13/las-100-million-affordable-housing-linkage-fee-could-pass-city-council/.

[21] Emily Alpert Reyes, L.A. promised more housing for homeless people - but some neighborhoods are way behind, LOS ANGELES TIMES, Mar. 20, 2019, https://www.latimes.com/local/lanow/la-me-ln-homeless-housing-hhh-20190320-story.html.

[22] Groups aim to raise awareness of renters' rights in rent controlled areas such as Boyle Heights, ABC7 LOS ANGELES, Nov. 2, 2017, https://abc7.com/southern-california-rent-boyle-heights-control-awareness-los-angeles-county/2597905/.

1   issue.  Mr. Huizar and his office managed to visit nearly every such unit, a stunning
2   nearly 15,000 homes.  Id.  Mr. Huizar also introduced legislation to prohibit owners
3   from wrongly manipulating the Ellis Act, which was being used to improperly evict
4   tenants from rent-controlled apartments.  Ex. 13.  And, on a number of projects, like
5   Mateo, Mr. Huizar sought and obtained direct payments into a CD-14 Affordable
6   Housing trust fund, which were meant to be repurposed to things like expiring rent
7   covenants and other community-stabilizing initiatives in other parts of CD-14.

8   **2.  Parks**

9   Mr. Huizar also sought to beautify the city through a revitalization of its parks.
10  Despite its size and wealth, Los Angeles spent far less money on parks than its peer
11  cities.  It moreover did so in a discriminatory way, as the wealthier westside possessed
12  more open space than the eastside.  Mr. Huizar attacked this problem in two ways: (i)
13  increasing the city's park budget through additional fees on developers, and (ii)
14  building parks, large and small, throughout the city.  The net effect of his work was to
15  interweave green spaces into the everyday lives of residents, allowing them to enjoy
16  greenery as they walked to work or to make a dedicated trip to one of the city's new
17  parks.

18  First, Mr. Huizar pushed to revitalize the city's collection of Quimby fees, a state
19  program requiring developers to make contributions to park development.  For decades,
20  the city's implementation of Quimby fees sat stagnant.  But Mr. Huizar orchestrated an
21  update of the policy that applied it more broadly to development and increased the fee
22  itself.[23]  The changes moreover expanded the city's authority to deploy the funds in a
23  broader geographic area, allowing the city to build parks where they were needed most,
24  rather than next to the developments paying the fees.[24]  As with Mr. Huizar's other

25

26      [23] Alice Walton, First change to developer fees in 30 years could bring in $30
    million more for L.A. parks, Los Angeles Times, Sept. 7, 2016, https://www.latimes.
27  com/local/lanow/la-me-ln-developer-park-fees-20160907-snap-story.html.
        [24] Damon Nagami, The New Quimby: Celebrating a Win for LA's Parks,
28  Natural Resources Defense Council, Sept. 27, 2016,
    https://www.nrdc.org/bio/damon-nagami/new-quimby-celebrating-win-parks.

work, it had real-world, positive effects for the city. These same fees were used a year later to complete the Arts District's first park.[25]

Second, Mr. Huizar was the driving force for the city's parklet program. He co-sponsored a pilot program at council to create "pocket parks" along the sidewalk in densely populated areas that would give residents an outdoor area to relax without having to travel to a more far-flung, larger park.[26] This need was particularly acute in Los Angeles, where half of the city did not live within a ten minute walk of a park.[27]

Third, Mr. Huizar pushed for the creation of larger dedicated parks in his district. Elephant Hill, described supra, is one such example where Mr. Huizar opposed developers to maintain open space in El Sereno. Mr. Huizar also orchestrated the creation of other parks including at York Boulevard and 50th Avenue in Highland Park, the Arroyo Playground in El Sereno, a dog park in Eagle Rock, the expansion of the 100-acre Ascot Hills in El Sereno, and more. Mr. Huizar was also the force behind the Vista Hermosa Park just southwest of the First Street Courthouse when he solved the Belmont Learning Complex issue while a member of the school board. Mr. Huizar also used his mediation skills to resolve a dispute between USC and the residents of Boyle Heights over the potential expansion of a road into Hazard Park. Mr. Huizar worked alongside community activists, and, in the end, USC opted to build in a different direction and donated more than a million dollars to the parks foundation.[28] The President of the Hazard Park Preservation Committee credited Mr. Huizar with negotiating through the tension and "bringing both sides together." Through the

---

[25] Christopher Hawthorne, Building Type: Long road to the Arts District's first park, LOS ANGELES TIMES, Jan. 19, 2017, https://www.latimes.com/entertainment/arts/la-ca-cm-building-type-hawthorne-2-2017-01-22-story.html.

[26] Ann M. Simmons, L.A.'s pocket parks are flourishing, supporters say, LOS ANGELES TIMES, Sept. 30, 2013, https://www.latimes.com/local/lanow/la-me-ln-parklets-pocket-parks-20130930-story.html.

[27] Dashiell Young-Saver, Through 'lost lots,' an effort to make L.A. more of a park place, LOS ANGELES TIMES, Aug. 22, 2014, https://www.latimes.com/local/cityhall/la-me-small-parks-20140823-story.html.

[28] Antonio Mejias, Hazard Park gets a $1 million makeover, BOYLE HEIGHTS BEAT, Feb. 14, 2015, https://boyleheightsbeat.com/hazard-park-gets-a-1-million-dollar-makeover/.

donation Mr. Huizar helped secure, the city was able to fund a toddler playground, improved walking paths, and new outdoor exercise equipment. He similarly secured significant funds to improve existing parks, including, for example, a million dollars to clean up Hollenbeck Park in Boyle Heights.[29]

However, of all his contributions to Los Angeles' parks, Mr. Huizar's largest legacy will likely be the Sixth Street Bridge replacement project that he shepherded through council and numerous bureaucratic chokepoints to replace an earthquake-prone historic bridge with a new landmark for the City of Los Angeles. Connecting the Arts District and Boyle Heights, the Sixth Street Bridge was a Los Angeles landmark dating from 1932 that featured prominently in movies and film but needed to be replaced due to safety concerns.[30] Mr. Huizar saw an opportunity to build badly needed parklands in two areas poorly served with respect to parks. Hence, the new Sixth Street Bridge would combine an iconic structure linking downtown and the eastside to honor its predecessor, with twelve acres of park below the massive edifice.[31]

Like most largescale public works projects, delay and challenges arose between the selection of the design and the start of building. And so when the project's park-like elements – stairs providing access to the top of the arches offering vistas of the city, ramps linking the bridge with the park below, and the arts plaza on the west side – were threatened by the state's determination that they were ineligible for state funds, Mr. Huizar leapt into action. He sent staff to Sacramento and worked with then-Congressmember Becerra and the state senate to secure $20 million to fill the

---

[29] Kris Kelley, $1 million improvement effort begins at Hollenbeck Park Lake, BOYLE HEIGHTS BEAT, June 30, 2015, https://boyleheightsbeat.com/1-million-improvement-effort-begins-at-hollenbeck-park-lake/.

[30] Yosuke Kitazawa, City Announces New Design for Sixth Street Bridge, PBS SOCAL, Oct. 19, 2012, https://www.pbssocal.org/shows/earth-focus/city-announces-new-design-for-sixth-street-bridge.

[31] Steven Sharp, Final Design Concepts Revealed for Sixth Street Viaduct Park, URBANIZE LOS ANGELES, Sept. 22, 2017, https://la.urbanize.city/post/final-design-concepts-revealed-sixth-street-viaduct-park.

1   shortfall.[32]

2       The fruits of Mr. Huizar's labor to build a new Sixth Street Bridge finally came

3   to fruition last year, with the opening of the bridge itself.  And construction began this

4   year for the twelve acres of parks, which will provide open space to two communities

5   sorely lacking it.[33]

6       **3. Other works.**

7       This sentencing memorandum could easily reach tome-like length through a

8   comprehensive review of Mr. Huizar's time on council.  This work – which has been

9   absent from the focus of the case until now – is an essential component of the man the

10  Court will be sentencing.  For the sake of brevity, Mr. Huizar notes his involvement in

11  a select few of his other diverse policies and initiatives:

12  • ReCode L.A.: an initiative to update Los Angeles's antiquated zoning laws to make
      far more building as of right, thereby reducing Council's (and Mr. Huizar's own)
13    power in development, Ex. 12;

14  • Exide Battery Plant Cleanup: Mr. Huizar pushed the state to address the risk of toxic
      contamination in Boyle Heights from the shuttered Exide battery plant in Vernon;[34]
15

16  • Hybrid Industrial Ordinance: a city ordinance easing zoning restrictions in the Arts
      District and industrial areas in return for various community benefits, further
17    accelerating the construction of housing without the need for discretionary
      intervention by Councilmembers (or Mr. Huizar);[35]

18  • DTLA Forward: an initiative to make downtown Los Angeles's streets safer for
      pedestrians and bicyclists, including by creating protected bike lanes;[36]
19

20      [32] Sahra Sulaiman, Sixth Street viaduct expected early 2019, BOYLE HEIGHTS
21  BEAT, Oct. 9, 2014, https://boyleheightsbeat.com/sixth-street-viaduct-expected-early-
    2019/.
22      [33] Gary Leonard, Construction begins for 12 acres of park space below the Sixth
    Street Viaduct, URBANIZE LOS ANGELES, Aug. 7, 2023,
23  https://la.urbanize.city/post/construction-begins-12-acres-park-space-below-sixth-
    street-viaduct.
24      [34] Emily Alpert Reyes, L.A. councilman joins calls to speed up toxic cleanup
    around Exide plant, L.A. TIMES, Feb. 12, 2016, https://www.latimes.com/local/lanow/
    la-me-ln-toxic-cleanup-exide-20160212-story.html.
25      [35] Council Approves Controversial Live/Work Ordinance, L.A. DOWNTOWN
26  NEWS, Feb. 18, 2016, https://www.ladowntownnews.com/news/council-approves-
    controversial-live-work-ordinance/article_391a171a-d4d8-11e5-95e4-
    abef7f35ae43.html.
27      [36] Ted Chen & Paolo Uggetti, New Plan Seeks to Improve Bike and Pedestrian
    Safety in Downtown Los Angeles, NBC LOS ANGELES, Mar. 23, 2016,
28  https://www.nbclosangeles.com/news/dtla-forward-bike-friendly-pedestrian-initiative-
    downtown-traffic-transportation/59201/.

26

- Clean Up Green Up: Mr. Huizar co-sponsored an environmental justice initiative to remediate overly polluted areas in the city by enacting special-use restrictions, economic incentives, and other measures;[37]

- Self Help Graphics: Mr. Huizar secured city funds to prevent a venerable eastside Los Angeles arts institution that supported Chicano art from losing its Boyle Heights home due to gentrification;[38]

- Murals: Mr. Huizar, working with advocates throughout Los Angeles, encouraged the city to adopt a new ordinance permitting muralists to create new works and removal of the city's ban;[39]

- People Street Program: the city's Department of Transportation's People Street program, which added parklets, bike corrals, and plazas, was first developed through initiatives developed by Mr. Huizar, including the city's first bike corral on York Boulevard in Mr. Huizar's district;

- Green Bike Lanes: Mr. Huizar piloted the city's first green bike lanes, which provide bicyclists with increased safety on Spring Street downtown and First Street in Boyle Heights;

- Pedestrian Headstart Signals: Mr. Huizar piloted the installation of pedestrian headstart signals on Broadway, which give pedestrians a four-second window to begin walking through crosswalks ahead of traffic, which increase visibility and pedestrian safety.[40]

- Operation Healthy Streets: an initiative to conduct outreach with the unhoused residents of Skid Row and to do deep cleanings of the area to limit the spread of disease among them;[41]

- Eagle Rock Vandalism: Mr. Huizar secured the assistance of the LAFD Search and Rescue team to remediate vandalism of the Eagle Rock, a monument in the neighborhood, which was too high for the city's normal staff to clean;[42]

---

[37] Tony Barboza, L.A. City Council adopts rules to ease health hazards in polluted neighborhoods, L.A. TIMES, Apr. 13, 2016, https://www.latimes.com/local/lanow/la-me-pollution-protection-20160412-story.html.

[38] Brittny Mejia, Amid anxieties over gentrification, art institution is one step closer to securing its future in Boyle Heights, L.A. TIMES, Dec. 5, 2017, https://www.latimes.com/local/california/la-me-ln-self-help-graphics-20171205-story.html.

[39] CBS Los Angeles, Council Votes to Lift Decades-Long Ban of Murals on Private Property in Los Angeles, CBS LOS ANGELES, Sept. 4, 2013, https://www.cbsnews.com/losangeles/news/council-votes-to-lift-decade-long-ban-of-murals-on-private-property-in-los-angeles/.

[40] Leslie Lopez, New traffic signals give pedestrians head start in downtown Los Angeles, ABC7 LOS ANGELES, Mar. 2, 2016, https://abc7.com/downtown-la-traffic-signals-crosswalks-pedestrians-jose-huizar-dtla/1227520/.

[41] Editorials, Endorsement: Jose Huizar for City Council, L.A. DOWNTOWN NEWS, Feb. 16, 2015, https://www.ladowntownnews.com/opinion/endorsement-jos-huizar-for-city-council/article_da74eb9c-b3d4-11e4-b86a-87c7966c5479.html.

[42] The Eastsider, Fire fighters come to the rescue of The Eagle Rock, THE EASTSIDER, Apr. 6, 2011, https://www.theeastsiderla.com/archives/fire-fighters-to-come-to-the-rescue-of-the-eagle-rock/article_b677ace4-4829-5613-a053-971afea8b6ef.html.

- Residential Beekeeping: Mr. Huizar led the successful effort to enact an ordinance to permit residential beekeeping following outreach from his constituents;[43]

- Farmers Markets': Mr. Huizar authored a successful motion to require farmers' markets in Los Angeles to accept EBT, i.e., food stamps, thereby increasing low-income residents' access to fresh food;[44]

- Urban Gardens: Mr. Huizar helped develop an Urban Agriculture Incentive Zone program that allows underutilized property to be used for farming within the city, enabling the community to plant gardens to provide healthy sustenance;

- Illegal Dumping: Mr. Huizar pushed for increased funding to address and increased penalties for illegal dumping, which had reached unacceptable levels in the city;[45]

- Utility Box Murals: Mr. Huizar commissioned local artists to beautify the city by painting murals on utility boxes throughout his district,[46] a program that has expanded throughout the city with 200 in CD-14 and 600 throughout the rest of the city;

- Valley Boulevard Bridge: Mr. Huizar secured $50 million to build a bridge to alleviate traffic and safety issues caused by a railroad crossing in El Sereno that created bottlenecks that city officials had spent thirty years failing to solve;[47]

- Ascot Hills Nature Park: Mr. Huizar helped bring the Ascot Hills Nature Park in El Sereno to fruition, a 140-acre park whose development had languished for years due to bureaucratic challenges until he took over CD-14;[48]

- Scholl Canyon Landfill: Mr. Huizar lobbied against the expansion of a landfill in Glendale which posed a significant health and environmental risk to his district in Eagle Rock, including by authoring a unanimously approved motion;[49]

---

[43] Lucy Feickert, <u>LA City OKs Urban Bee Keeping Ordinance</u>, NBC4 Los Angeles, Oct. 14, 2015, https://www.nbclosangeles.com/news/city-council-to-approve-urban-bee-keeping-ordinance/63317/.

[44] Valentina Silva, <u>Farmers Markets Are Now Accepting Food Stamps, But That's Not Enough</u>, L.A. Magazine, May 24, 2016, https://lamag.com/food/5-ways-get-low-income-shoppers-farmers-markets.

[45] Contributing Editor, <u>L.A. Councilman Aims to Increase Enforcement on Illegal Dumping Downtown</u>, MyNewsLA, June 5, 2019, https://mynewsla.com/crime/2019/06/05/l-a-councilman-aims-to-increase-enforcement-on-illegal-dumping-downtown/.

[46] Lourdes Espinoza, <u>Utility boxes along First Street become public art canvases for local artists</u>, Boyle Heights Beat, Nov. 15, 2013, https://boyleheightsbeat.com/utility-boxes-along-first-street-become-public-art-canvases-for-local-artists/.

[47] Hector Becerra, <u>Valley Boulevard bridge unclogs a bottleneck in El Sereno</u>, L.A. Times, Feb. 2, 2009, https://www.latimes.com/archives/la-xpm-2009-feb-02-me-elsereno2-story.html.

[48] Esmeralda Bermudez, <u>After numerous attempts, construction of Ascot Hills Park begins</u>, L.A. Times, June 28, 2010, https://www.latimes.com/archives/la-xpm-2010-jun-28-la-me-ascot-20100628-story.html.

[49] Lila Seidman, <u>Glendale officials abandon plans to expand Scholl Canyon Landfill</u>, L.A. Times, Sept. 17, 2019, https://www.latimes.com/socal/glendale-news-press/news/story/2019-09-17/scholl-canyon-landfill-expansion-abandoned.

- Northeast Hillside Ordinance: Mr. Huizar championed an ordinance to help protect the hillsides in Northeast Los Angeles from overdevelopment, placing limits on the amount of grading that can be done on hillside properties, as well as building height, retaining wall height and square footage allowed for all new construction projects in the area. The ordinance brings safe, uniformed standards to the communities while protecting against over-development;[50]

- Open-for-Business Initiative: Together with Mitch O'Farrell, Mr. Huizar was behind a push to cut red tape and streamline regulations in order to make doing business in the city easier, particularly for small operators, Ex. 14;

- Evergreen Cemetery: Mr. Huizar authored a motion requesting an ordinance to prohibit used car sales that were monopolizing the parking around Evergreen Cemetery, one of Boyle Heights' few open spaces;[51] and

- Finally, in addition to his role on PLUM, which has been the near-exclusive focus of this case, Mr. Huzar was also a member of numerous standing committees during the key time periods in the FSI, including Economic Development, Public Safety, Housing, and the Environment, along with ad-hoc committees for issues including the Los Angeles river, the football stadium, and immigration.

### III. ARGUMENT

As this Court knows well:

Imposing a sentence on a fellow human being is a formidable responsibility. It requires a court to consider, with great care and sensitivity, a large complex of facts and factors. The notion that this complicated analysis, and moral responsibility, can be reduced to the mechanical adding-up of a small set of numbers artificially assigned to a few arbitrarily-selected variables wars with common sense. Whereas apples and oranges may have but a few salient qualities, human beings in their interactions with society are too complicated to be treated like commodities, and the attempt to do so can only lead to bizarre results.

United States v. Gupta, 904 F.Supp.2d 349, 350 (S.D.N.Y. 2012), aff'd, 747 F.3d 111 (2d Cir. 2014). Indeed, while the advisory guidelines introduce a machine-like element, sentencing is a fundamentally human exercise in judgment and common sense. The end goal of that exercise is not to tabulate numbers, but to measure a man and his circumstances, in all their complexity, and arrive at a result "sufficient, but not greater than necessary" to achieve all the goals of federal sentencing. 18 U.S.C. §

---

[50] L.A. Dep't of City Planning, Northeast Hillside Ordinance, https://planning.lacity.org/plans-policies/overlays/northeast-la-hillside-zone-change.
[51] The Eastsider, Shopping for a used car? Perhaps it's time to head to Evergreen Cemetery, EASTSIDER L.A., Dec. 17, 2014, https://www.theeastsiderla.com/news/business/shopping-for-a-used-car-perhaps-it-s-time-to-head-to-evergreen-cemetery/article_f2584905-4357-5170-ba11-ee3dc84a87fb.html.

29

1   3553(a).

2       Here, the Court can achieve that objective by imposing a 9-year term in custody,

3   which would punish Mr. Huizar for his transgressions and send a meaningful deterrent

4   message, while also acknowledging his mitigating personal characteristics, positive

5   contributions to the community, nonexistent recidivism risk, family ties and

6   responsibilities, significant collateral punishment, and the need to avoid unwarranted

7   disparities and similarities.

8   **A.  A 9-year sentence would fairly balance the wrong that Mr. Huizar has done in**
    **this case with his mitigating personal history, lifetime of good works, devotion**
9   **to family and friends, age, health, and other laudable personal characteristics.**

10      § 3553(a)(1) requires courts to consider the "history and circumstances" of each

11  defendant.  This command reflects the uniform and constant federal judicial tradition

12  for the sentencing judge to view "every convicted person as an individual and every

13  case as a unique study in the human failings that sometimes mitigate, sometimes

14  magnify, the crime and the punishment to ensue."  <u>Gall v. United States</u>, 552 U.S. 38,

15  52 (2007).  In particular, the Supreme Court has emphasized that possessing "the fullest

16  information possible concerning the defendant's life and characteristics" is "[h]ighly

17  relevant – if not essential – to [the] selection of an appropriate sentence."  <u>Pepper v.</u>

18  <u>United States</u>, 562 U.S. 476, 488 (2011) (everything omitted).  Underlying this notion

19  "is the principle that the punishment should fit the offender and not merely the crime."

20  <u>Id.</u> at 487-88.

21      While it is rarely possible to capture the richness and complexity of a person's

22  life in a legal filing, that is perhaps uniquely true for Mr. Huizar.  As described above,

23  he has lived a remarkable life of almost novelistic proportions.  Born into poverty in an

24  adobe home in rural Mexico, he immigrated to the United States as a toddler, overcame

25  extraordinary odds, and, lifted by the dreams and aspirations of his family, made his

26  way in the world through hard work, education, and human connection.

27      In his adult life, he eschewed high-paying private-sector jobs principally out of a

28  desire to better the circumstances of families and communities like his own.  For a

30

time, he was a beloved and highly-successful official representing his hometown neighborhood – where he was formed and still lives to this day – and considered to be a rising political star with limitless potential.  As a representative, he was known for his boundless energy and enthusiasm, and as a person who bridged divides, displayed compassion for his fellow man, and achieved remarkable advancements for the city.

Once a respected pillar of the community, he enjoyed the love and support of his wife and children, his extended family, and hundreds of friends, and was equally comfortable in a City Hall meeting as he was at a punk-rock show or a religious festival in his hometown.  On a personal level, Mr. Huizar was – and remains – profoundly interesting and charismatic, a person with a repressible wit and important perspective whose knowledge of the city and its issues is immeasurable.

At the same time, Mr. Huizar was a philanderer, a gambler, and an alcoholic. And while he did exceptional things in his public life, he also did inexcusable ones, and he abused the position to which the community entrusted him.  Through his actions, he extinguished his once-promising potential and dashed the hopes of many.

Lately, he has experienced a downfall of almost-incalculable proportions. Beginning with the raids on his home, his family has been slowly destroyed, his children have been deeply affected, and, in his mid-50s, he is preparing to enter federal prison – away from his elderly mother, whom he cares for, and his four school-aged children who love their father and depend on him greatly – for no less than 9 years.  He has lost his reputation, his professional license, his career, his identity, his marriage, and many longtime friends.  And all of this has happened in the most public setting imaginable.

This is a profoundly tragic story that has affected many people.  It is also a story that has been confounded by relentlessly negative publicity and simplistic narratives that rush like the tides to declare a person as good or bad.  In truth, as with all things and people of consequence, Mr. Huizar is "not good or bad but good and bad."  And, perhaps at a certain level, "the good comes out of the bad and the bad out of the

31

1    good[.]"  Whatever the case, in the real world, few people are all one thing or another.

2    And that is rarely more true than it is for Mr. Huizar.  He is a deeply human and

3    uniquely "complicated contraption," who has overcome significant odds, done great

4    things, failed spectacularly, and confessed completely.

5          The dozens of letters compiled in Exhibit 1 sketch in some of the details of Mr.

6    Huizar's life.  In addition to these letters, the Court should know that there remains a

7    substantial-but-silent wave of community appreciation – from small business owners,

8    community activists, prominent officials, and everyday people positively affected by

9    Mr. Huizar's past efforts or acts of kindness – which continues to support Mr. Huizar,

10   but feels reluctant to say anything publicly due to negative publicity.[52]  Still, through

11   memories and anecdotes, the letters that have been submitted share powerful themes of

12   devotion to family and friends; industriousness; good works; passion for people;

13   compassion for the unfortunate; resilience in the face of adversity; and caring for loved

14   ones.

15          **Devotion to family and friends.**  One of the most prominent threads tying

16   together the sentencing letters is Mr. Huizar's love for his children and extended

17   family, the positive impact that he has had on their lives, and their love and admiration

18   for him in return.  Indeed, despite the turmoil that this case has caused, Mr. Huizar's

19   older children all submitted letters describing their love for their father, the important

20   role that he plays in their lives, and their belief that he is fundamentally a good person

21   and a loving dad who has tried to do his best. ████████████████████████

22   ██████████████████████████████████████████████████████

23   ██████████████████████████████████████████████

24   ───────────────────

25        [52] Characteristic of many responses received by the defense in preparation for sentencing is an email that Mr. Huizar's counsel received from the leader of a prominent local organization: "I've been advised by my legal counsel at work and board

26   members not to submit a letter for [Mr. Huizar's sentencing].  They understand that Jose Huizar has made valuable contributions to our society but worry that this case might impact our organization, even if i do write it as an individual.  Please know that it

27   hurts me to send this response to Jose, as he and his family have been such special people to my [spouse] and I, and as you and I discussed, has made countless

28   contributions to the betterment of education and equity in Los Angeles."

                                          32



Other younger members of Mr. Huizar's family similarly describe Mr. Huizar's parental love and positive impact on their own lives.  His niece, Maura Morales, writes:

> When my mother, his cousin, faced the challenges of single parenthood, Jose generously took me under his wing, providing me with life-changing opportunities.  His support extended beyond mere words; he clothed me, fed me, and served as a father figure during a crucial time in my life. Jose's encouragement and guidance were instrumental in helping me navigate through college, culminating in my current status as a senior at UCLA.  I can confidently say that without his support, I would not have reached this point in my academic journey.

Ex. 1-39.  Mr. Huizar's younger cousin, Mario Barrios, tells a similar story:

> As busy as he was with his career, Jose seemed to make time to evaluate my academic work throughout my early childhood education leading into my tertiary education where I ended up receiving my associate's,

#:27796

> bachelor's, and master's degree in environmental policy with his help. His
> assistance throughout the past 40 years of my life has significantly
> impacted the quality of my life, ensuring I became a respectable person in
> society and made a positive contribution to my community.  It is because
> of Jose that I became a public servant, I work for the Arizona Department
> of Environmental Quality where I have the privilege of protecting and
> enhancing public health and the environment in the State of Arizona.

Ex. 1-43.

Older members of Mr. Huizar's family praise his lifelong commitment to hard work, education, and helping others, describing him as a loving family member, the "favorite son" to his parents, and "the joy and pride of the family."  Ex. 1-50 [Norma Montero]; Ex. 1-4 [Gloria Galvan ("My brother Jose is the 5th of 6 children; however, due to his kind heart and soft heart for animals and people, he was, is and continues to be my mother's favorite son")]; Ex. 1-5 [Yolanda Huizar ("Once he was in politics and I attended lots of his events and saw the tremendous amount of people that followed him and loved him for the humble person he is it would bring tears of joy to my eyes of just thinking he was my brother")]; Ex. 1-6 [Isidra Huizar ("My son Jose was the easiest son to raise of all our 6 kids.  He was humble and kind, he listened to me and his father and did what he was told.  Even though his father would yell at him and scold him for being so quiet . . . . Jose is a very agreeable son and has always been very studious. He is the most studious of all our kids.  My son Jose is different, he has discipline and always worked on his studies or work.  He was the only child that would study late through the night. My son Jose took care of himself, from getting his clothes ready and everything.")]; Ex. 1-40 [Porfirio Serrano ("He is a hero in his Los Angeles and the Jerez community) and just as importantly he is his extended families' hero, pride and joy")].  As aptly summarized by his cousins, Efrain and Claudia Huizar:

> He is a son, a father, a brother, an uncle and cousin.  He grew up humble,
> hardworking and honest[.]  He shared the same struggles and experiences
> in life as we did.  He is loved and respected to this day[.]

Ex. 1-38.

In addition to letters from his family, Mr. Huizar has also submitted letters from several longtime friends.  Mr. Huizar's ability to maintain these close, decades-long

friendships says something in itself.  But the letters say much more.  They describe an

innate leader who, from his early days, felt a deep commitment to social justice and

bettering the lives of his friends and others.  See, e.g., Ex. 1-31 [Mauro Arteaga ("At

Salesian, he was everyone's friend and had no problems befriending students from all

grades . . . . As a young freshman he displayed natural leadership skills and was

encouraged to run for Associated Student Body (ASB) president and did so for four ( 4)

years.  He took the position to initiate changes that would benefit his class and the

school at large.")]  For example, one of Mr. Huizar's friends from Salesian High

School writes:

> I first met Jose at Salesian high school as we both grew up in Boyle
> Heights. Jose Huizar changed my life during a tough time in my life.
> Unbeknown to Jose, during high school, he helped many teenage students,
> including myself, in dealing with our insecurities of growing up in an
> impoverished neighborhood.

Ex. 1-30 [Martin Arteaga].  Mark Raffield, a friend from college, describes how he and

Mr. Huizar connected over their "modest immigrant childhood[s]" and desire to

improve the lives of those less fortunate: "We both understood how fortunate we were

to attend a university given our humble background, and that we have a real

opportunity to make a difference in the world and to help the less fortunate people like

his parents in the society."  Ex. 1-35.  Another friend, Algernol Boozer, writes:

> From the early days of our friendship, Mr. Huizar and I engaged in
> numerous discussions about our shared desire to be agents of positive
> change in our community.  I distinctly remember our late-night
> conversations, fueled by our mutual passion for making a difference.  Mr.
> Huizar consistently expressed a strong commitment to service and
> community betterment.
> ***
> After completing my undergraduate studies, I pursued a career in the
> military as an officer while Mr. Huizar continued his education . . . . His
> academic pursuits have consistently aligned with his mission to serve the
> community, exemplified by his involvement in student government during
> his time at Berkeley.

Ex. 1-27.

**Industriousness and good works in the community.**  Along with devotion to

family and friends, another theme running throughout Mr. Huizar's sentencing letters is

a history of good works in the community.  While it is virtually impossible to catalogue all of the positive contributions that he has made to the city during his nearly 20 years in office, a small sampling of his major accomplishments is discussed above.  Equally important, however, were Mr. Huizar's tireless efforts to better the lives of everyday people across his diverse district in ways that frequently received little attention, as recounted in several constituent letters.

In Highland Park, for example, Yolanda Noguiera, President of the Chamber of Commerce, recalls Mr. Huizar's positive role in several community projects and events, summarizing her feelings as follows:

> Jose Huizar was connected to his entire community, like he was part of the family, so many people loved him and still do.  Jose has a warm sense of humor that kept us laughing at meetings, he was magnetic, compassionate, and loyal.  We never had a councilmember work so hard for us and fight for us, who sincerely cared for the well-being of our community than Jose Huizar.  After the news broke our hearts dropped. We knew this was totally out of character for him, it was shocking to us, we were stunned but we did forgive him. He has done so very much for our quality of life in our neighborhoods.  An exceptional human being.  We have hope for him and believe in him.

Ex. 1-20.  Trish Gossett, a former member of the Neighborhood Council, writes that Mr. Huizar's "[l]and [u]se knowledge was valuable" to improving Highland Park, and that he "always found resources to make our community better":

> He provided funding needed to implement a Historic Protected Overlay Zone in our historic district, which the community will always be thankful for.  After decades of dereliction and toxicity, Jose masterfully turned a vacant lot which required endless remediation and funding into a very popular and beautiful playground in the center of our community.  No easy feat.  He did this because he was sensitive to the needs in the community.  For me personally, he then orchestrated the funding for a beautiful mural on an ugly building overlooking our beautiful playground.  Jose implemented bike lanes, and much needed safety measures.  He supported our Seniors, via our Senior Center, with funding for new programs.  He also supported Veterans, via his participation and contributions to Veteran events. He was liked for his attention paid to them on a personal level.  He earned the respect of the community through the many positive changes he helped us with, and so was easily re-elected until his term was over due to term limits.

Ex. 1-21.

In Eagle Rock, a former member of the Neighborhood Council, John Goldfarb,

36

writes similarly of his experiences with Mr. Huizar:

> In an eclectic council district of diverse neighborhoods with a total population of over 260,000, Jose consistently "showed up" for Eagle Rock in a variety of ways, sponsoring public events like concerts in the park, Fourth of July fireworks, the annual Christmas tree lighting ceremony, and the Eagle Rock Music Festival, and formally honoring local businesses and residents who made special contributions to our neighborhood.  He took principled positions on issues he believed would benefit his constituents, such as the reconfiguration of Colorado Boulevard to include bike lanes; advocating for the reduction of pollution from the Scholl Canyon landfill; and many street improvements encompassed by Take Back the Boulevard.  He endorsed and secured funding for a new park at the corner of York Boulevard and Avenue 50; the creation of an off-leash dog park at the Eagle Rock Recreation Center; and parklets in various locations which have improved the quality of life for residents and visitors to our district.  He sponsored food giveaways for needy residents and in his public and private remarks always displayed genuine concern for the welfare of the people he served.

Ex. 1-16.  Michael Nogueira, President of the Chamber of Commerce concludes: "Our neighborhood began to thrive because of the care and consideration of a man who understood the importance of family and community."  Ex. 1-17.

In Boyle Heights, Mr. Huizar's own neighborhood, the aforementioned Ms. Amador (Section II, supra.) praised Mr. Huizar's "passion to help those in need and to deliver for his constituents," and, in a must-read letter, describes a compendium of specific achievements ranging from installing traffic lights and bike lanes to ushering in the new 6th Street bridge.  Ex. 1-9.  Longtime resident, Antonio Garcia, recounts Mr. Huizar's positive impact on the community dating back to the early 2000s:

> He triumphed in 2004, and almost from the beginning as a new councilman, our community began to see great changes that we are very grateful for.  He helped our dark and unsafe streets with new lights, installed stop signs at our local schools for the safety of our students, created a bin cleanup program so that the community can dump large items and keep our neighborhoods clean, fixed sidewalks broken by trees for the safety of pedestrians, and paved streets that were badly damaged.  Jose Huizar also had all of our public parks cleaned up so that families would feel safe to bring their families again, as well as installed exercise equipment around our community to keep our community active.  The most important project for me personally was the cleanup program that he created by hiring members of our community to clean the streets of Boyle Heights, El Sereno, and Eagle Rock.  This was a great idea because who else to keep the city clean than its own inhabitants?  Jose Huizar gave the retired men and women the opportunity to feel useful again by returning to the workforce and not feeling displaced by hiring them for this project that still operates to this day with at least 23 members of the community.  Thanks to Jose Huizar, our community began to feel safe again and finally

37

welcomed by the first councilor who made a great change and who is still very loved and respected in our community.

Ex. 1-12.  Caridad Vasquez, a street vendor, writes on behalf of Vendedores in Accion about Mr. Huizar's support for largely-immigrant and women street vendors:

As a community of immigrants and most vulnerable women of color whom had to create our own alternative to form part of the non-informal economy, we believe it is our duty to share all the positive support that enabled our campaign to thrive was immensely due to the support of Jose Huizar.  When we were hiding in the shadows of oppression and criminalization of street vendors, Jose Huizar was our beacon of hope in creating the pathway for the legalization of Street Vending.  Many times when we needed economic support Jose Huizar would resiliently connect us to job opportunities to keep ups afloat in having sustainability to feed our families.  We hope that our letter brings light to the amazing work that was done in transforming not only the lives of the street vendors in CD14 but as our work was successful in legalizing street vendors statewide and Jose Huizar was very much part of the success.

Ex. 1-11.  Father Gabrielli, of the Dolores Mission, recalls Mr. Huizar using his land-use knowledge to expedite the entitlement of a school and personally engaging with the community on numerous pressing issues:

On multiple occasions I was aware of the presence of Mr. Huizar on the streets and in the projects at times when the community needed support because of shootings, killings, and increased violence.  Mr. Huizar often sought input from community residents, leaders, and people serving the community through churches, schools, and other nonprofit organizations. Mr. Huizar and his staff were always quick to respond to our requests for urgent graffiti removal when tensions were escalating in our community. As community groups came together to offer children in the community programs throughout the summer to help keep them out of reach from the gangs and therefore on a safer path toward their future, Mr. Huizar and his office provided programing support, helped find transportation for outings for children from the projects, and Mr. Huizar and his staff would often be visible at events in our parks, playgrounds, and even walking through the streets as we gathered the community to walk for hope and peace on our streets.

Ex. 1-8.  Raymond Rios, a longtime community advocate, writes of Mr. Huizar's efforts to protect the poor and vulnerable against powerful interests:

Whenever there was a community battle, he defended his constituents and valued their concerns, often against very powerful forces, such as USC, and Union Pacific Railroad.  When our city was in a financial crisis and began cutting vital emergency services to residents referred to as, "Brown outs", he was one of the few Councilmembers who objected to these cuts that jeopardized the welfare of residents.  He fought hard to restore adequate funding for these vital city services.

Ex. 1-10.  Reflecting the feelings of many, Father Greg Boyle of Homeboy Industries

writes: "I can't think of any office holder who was more of a beneficial presence in

Boyle Heights than Jose Huizar."  Ex. 1-7.a.; Ex. 1-32 [Sergio Diaz ("As a business

owner in the Boyle Heights area since 1968, I can adamantly say that I had never seen a

more capable community leader than Mr. Huizar")] .

In El Sereno, Joel and Therese Cano recall, among other things, Mr. Huizar's

efforts to save their working-class neighborhood from a freeway expansion:

> I am nearly a life long member of El Sereno, having grown up and
> attended grade and high school here and returned as an adult to take care
> of my mother.  In early 2011, I informed my husband about a possible
> critical event jeopardizing our neighborhood and our home.  That threat
> was the extension of the 710 freeway.  I took this threat very personally, as
> my parents were neighbors that fell in love, in Chavez Ravine.  Having
> lost my mother in 2006 and father in 2001, I knew their spirits would not
> rest easily knowing eminent domain was again looming over our family.
> Mr. Huizar was a constant and vigilant member of the MTA Board at the
> time.  He saw our concern and was instrumental in defeating the proposed
> devastation.  I also had heard that Mr. Huizar was proactive with our
> senior citizen center.  His generosity with his time and budget brought
> much joy to our seniors.  My personal gratitude to Mr. Huizar, was his
> staff direction in supporting my beloved Dia de los Muertos event.  This
> free and family event brought more commerce to the neighborhood
> specifically during the economic downfall and for years following.  2024
> will be its fifteenth year.  His vision in the bridge completion from Valley
> Boulevard to City Terrace was a huge boon to our neighborhood.
> Changing an unsightly space to the lovely El Sereno Arroyo Playground
> and Garden Labyrinth nearby was another of his successful projects.  His
> proactivity in Ascot park by involving habitat restoration has renewed the
> ecosystem in these hills.  I believe the diagonal street parking also
> implemented, has been a great visual and space improvement.

Ex. 1-18.  Jackie Carillo, a former member of the Neighborhood Council, writes about

the absence she and other community members have felt since Mr. Huizar left office:

> The community has not been the same since Mr. Huizar has left office.
> The spirit of unity is missing & that since of belonging. Traditions that
> have been started since he took office, established over the years when he
> held the CD14 office position.

Ex. 1-19.

Finally, in DTLA, Betsy Starman shares a similar sentiment about her experience

during and after Mr. Huizar's tenure in office:

> During my 10 years downtown, I was lucky enough to get to meet our City
> Council member of that time, Jose Huizar.  He was personable and
> professional and was able to actively listen to concerns about mental

39

health reform, the lack of treatment for the addicted and unhoused, and he supported my view on our current process which is governed by the Lanterman Act. He heard me. I engaged in his campaign and during that time I witnessed the growth and hope for a city that had basically been boarded up and forgotten. In the years I worked with Mr. Huizar, I watched the City of Los Angeles turn around completely. It was an amazing time. We had community, we had local and district meetings, we were together in making DTLA a great place to work and live. Mr. Huizar was able to create the motivation we needed to have hope for our city. All of this does not negate what this court case is about, but to say that the good that Mr. Huizar brought to the table far outweighed the bad. When he was moved out of his position, things turned around for all of us. After a couple of years of him being removed, the progress stopped. Completely stopped. He was gone. He had brought so much to the businesses and residents of DTLA and it just stopped. He had worked WITH us. He treated all people with unconditional high regard and was a great example of what a representative could be. I understand that it is now time for Mr. Huizar to be sentenced. I ask you to please take into consideration the good, the community, his ability to be fair to ALL of us and his dedication to all of us when you pronounce his sentence.

Ex. 1-24.

To be sure, Mr. Huizar's record of public service and good works in the community – both large and small – does not cancel out his crimes. But it challenges the caricature of him painted throughout this case, reflects his true character and the value that he has and can continue to add to society, and should be considered alongside his wrongdoing when fashioning a sentence. United States v. Rita, 551 U.S. 338, 365 (2007) (Stevens, J., concurring) (sentencing judge may consider public service under § 3553(a)); United States v. Carter, 530 F.3d 565, 578 (7th Cir. 2008) (sane); United States v. Adelson, 441 F.Supp.2d 506, 513-14 (S.D.N.Y. 2006) (recognizing defendant's good deeds, including numerous acts of compassion and generosity, in granting significant sentence reduction); United States v. Bennett, 9 F.Supp.2d 513 (E.D. Pa. 1998) (in largest charitable fraud in U.S. history, granting pre-Booker departure from 232 to 92 months where defendant made substantial contributions in the areas of substance abuse, children and youth, and juvenile justice).

**Unseen compassion.** Along with the good works that Mr. Huizar performed in his public life, several letters describe private acts of human kindness. For example, a childhood friend recalls Mr. Huizar helping him get a job after his father was laid off

40

from work:

> Jose and I both came from families that could not afford the tuition to attend a parochial school.  However, we knew that attending Salesian High School was our best opportunity to ensure we were accepted to esteemed universities in order to pursue our career dreams . . . . In the beginning of our sophomore year, my father was laid off and left unemployed. Jose helped me to get a job at the video store which allowed me to continue to attend Salesian.

Ex. 1-26 [Alberto Arteaga].  Decades later, Adam Acosta, writes similarly about Mr. Huizar giving him a job during a time of need:

> After 25 years of a career for AFSCME, I was abruptly terminated in 2018. One day in August, I was visiting with Mr. Huizar as we often spoke about politics, the neighborhood and his kids. During our visit, I shared that I was terminated abruptly from AFSCME. Within moments of I sharing my news he stopped the conversation and said "what are you doing for yourself"? "Do you have a paycheck, do you have health care benefits"? I said, " I have nothing, Jose!".  The next day, I got a call from his chief of staff and I was offered a job working within the councilman staff.  I didn't ask for a job, rather Mr. Huizar and I were having a normal conversation like we did so many times before that day in August of 2018. Mr. Huizar getsure to offer me a job was so significant that allowed me to continue to move forward and not fall into depression and desperation because in the past several years prior to 2018, I lost my marriage in 2014 and 2016 my mother passed away and in 2018 I lost my career at AFSCME.

Ex. 1-28.  In a different setting with echoes to some of the events in this case, Mauro Arteaga writes of Mr. Huizar's kindness to his son:

> A few memorable moments I will never forget were when he was asked to be the keynote speaker at my son's graduation ceremony at Salesian Catholic High School.  After delivering his powerful message to the graduating students, he stood late at the ceremony to personally congratulate each of the students including my son.  My son to this day has not forgotten the special moment he had with Jose.  Another memorable moment was when my son asked Jose if he would provide him with a Letter of Recommendation for admissions to the UCLA school of law. Not only did Jose take time from his busy schedule as Councilman to draft the letter, but he also invited my son to lunch where he provided him with meaningful career advice as my son prepared for his journey to become a licensed attorney.  Regardless of his busy schedule, Jose is known to find the time to help his friends and the members of his constituency.

Ex. 1-31.

Notably, these acts of kindness were not done with an eye toward looking good at a future sentencing.  They were not done for powerful people or for people who had given Mr. Huizar anything in return.  Performed while nobody was watching, they are a

41

reflection of who Mr. Huizar really is – compassionate, generous, and deeply human.

**Resilience in the face of adversity.**  As the Court has already read, Mr. Huizar was born into poverty and overcame substantial hardships along the way to his former career as a city leader.  While in public life, he faced constant challenges, and, at times, withering criticism.  Other than recent events, however, no event in his life was harder than the sickness of his young children, one of whom was diagnosed with kidney disease and the other of whom was diagnosed with leukemia.

During this challenging time, Father Gabrielli of the Dolores Mission recalls that Mr. Huizar was not only seeking blessings for his child, but "offering hope and support for families in our community that were struggling with illness in their homes [and] experiencing the loss of a loved one[.]"  Ex. 1-8.  "When I think of Mr. Huizar," he writes:

> I remember him coming to the church asking for prayers and blessings for the health of his child.  I remember Mr. Huizar and his family coming to our church to give thanks for the improved health of their child.  I remember Mr. Huizar sharing words of hope and support when speaking with the distraught mother of one of our teens who was critically ill with a very aggressive form of Leukemia.  I remember Mr. Huizar walking down the street with our community as we mourned the loss of another of our young neighbors to violence.

Id.

Mr. Huizar does not suggest, fatalistically, that any of the hardships that he has faced absolve him of misconduct.  But they do in some way mitigate his culpability and lessen the moral imperative for a lengthy custodial sentence.  See Douglas v. Woodford, 316 F.3d 1079, 1090 (9th Cir. 2003) (childhood adversity and other lifetime difficulties reduce moral culpability); United States v. Carter, 560 F.3d 1107, 1118 (9th Cir. 2009) (factors relevant to § 3553(a)(1) include mitigating childhood history and difficult life events).  More importantly, the difficulties that Mr. Huizar has faced are relevant to measuring his character and potential, and to tracing the arc of his progress over time.  Against atypically-long odds, he emerged as a hard-working, caring, and resourceful man, albeit one with lasting imperfections.  His demonstrated ability to

respond positively to major disappointments reflects uncommon resilience, the potential for positive change, and a redemptive capacity that substantially reduces the need for a long term in prison.

**Caring for loved ones.**  A final noteworthy theme running throughout Mr. Huizar's sentencing letters is the care that he provides for vulnerable members of his family.  As Mr. Huizar's 83-year-old mom writes of her son:

> He handles all my medical needs from my dentist, my optometrist, and my heart doctor and knee, and primary doctor.  He handles my prescriptions, and he picks them up for me and he talks to my doctors about my medical conditions, my son knows all my medical conditions.  I call him for everything, and he solves my problems.  More than anything, at my age of 83 years old with my medical conditions I need him desperately, and I don't even want to think about life without him.

Ex. 1-6.



He is concerned that, as with his father, he may not be there for his mother at the end of her life.  See Ex. 1-5 [Yolanda Huizar ("I told Jose that he needed to come home as soon as possible to say his goodbyes to our Dad while he was alive.  Jose booked a flight home for the next day but did not make it on time before my Dad passed.  It was very hard and sad that Jose was not able to come visit and be with our Dad.  That destroyed Jose even though he knew that it was a sacrifice that he had to make due to being in school.")].  He is concerned that his four children will be left destitute following his sentencing, returning to the poverty from which he temporarily escaped.

Mr. Huizar's family members are likewise distraught at the prospect of losing him for any time, let alone during his kids' formative years and at the end of his mother's life.



[53] Care for vulnerable people and impact on families is a well-recognized basis to reduce a sentence. United States v. Autery, 555 F.3d 864, 874 (9th Cir. 2009); United States v. Lehman, 513 F.3d 805, 807-09 (8th Cir. 2008); United States v. Baker, 502 F.3d 465, 469 (6th Cir. 2007); United States v. R.V., 157 F.Supp.3d 207, 255-60

44

***

Nobody disputes that Mr. Huizar has done many things wrong in his private and public life or that, for the latter, he deserves to be punished.  But sentencing is not only about the bad things that a person has done to land himself or herself in federal court.  Rather, as one judge put it:

> [I]f ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance.  This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, the history and characteristics of the defendant.

Adelson, 441 F.Supp.2d at 513-14.  Here, a sentence to the low end of the 11(c)(1)(C) would appropriately balance the bad in Mr. Huizar's life with the significant and undeniable good.[54]

_____

(E.D.N.Y., 2016); United States  v. Chambers, 885 F.Supp. 12, 14 (D.D.C. 1995); United States  v. Hammond, 37 F.Supp.2d 204 (E.D.N.Y. 1999).

[54] Several other factors not captured in the letters also weigh in favor of a reduced sentence, including Mr. Huizar's age and health.  Now in his mid-50s, Mr. Huizar is not only highly unlikely to re-offend, see Section III.B., infra., he will suffer outsized physical and dignitary punishment from even a brief time in prison.  See Human Rights Watch, Old Behind Bars: The Aging Prison Population in the United States 7, 43-88 (2012).  Along with having greater problems with day-to-day activities, older inmates are more vulnerable to contagious diseases, the effects of inadequate medical care, harassment by other inmates, and depression.  Joann B. Morton, An Administrative Overview of the Older Inmate, U.S. Dep't of Justice, National Institute of Corrections, 4 (1992); U.S. Dep't of Justice, Nat'l Institute of Corrections, Correctional Health Care: Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates 10 (2004); U.S. Bureau of Prisons, Management of Major Depressive Disorder 2 (2014).  For those reasons, among others, courts increasingly vary downward to avoid sending older inmates to jail, or to limit the amount of time they spend behind bars.  See, e.g., United States v. Lee, 725 F.3d 1159, 1169 (9th Cir. 2013) (remanding for greater consideration of defendant's advanced age); United States v. White, 506 F.3d 635, 644 (8th Cir. 2007) (affirming downward variance in CP case based partly on the defendant's age, 51).  Mr. Huizar's health concerns also support a lesser custodial sentence.  As described at page 6 of the Recommendation Letter, Mr. Huizar suffers from hypertension, high cholesterol, and anxiety, and is experiencing a major depressive episode.  He is also an alcoholic and, although never evaluated, possibly a gambling addict as a result of the complete collapse of his life and his family.  While the Bureau of Prisons can theoretically treat these conditions, a reduced custodial sentence is appropriate given § 3553(a)(2)(D)'s command to fashion a sentence that provides "medical care . . . in the most effective manner."  See 18 U.S.C. § 3553(a)(2)(D); United States v. Edwards, 595 F.3d 1004, 1011 (9th Cir. 2010)

**B. A 9-year sentence is far more than necessary to prevent recidivism, protect the community, and achieve specific deterrence**

A low-end sentence is also appropriate because, while some confinement is necessary for punitive reasons, neither the need to protect the public nor the need to prevent recidivism supports a lengthy custodial sentence.  A shorter custodial term would also balance punishment considerations with the equally-important public-safety goals of maintaining family cohesion and promoting rehabilitation.  See Pub. L. No. 98-473, § 239, 98 Stat. 1987, 2039 (1984) (note to 18 U.S.C. § 3551) (directing that "sentencing decisions should be designed to ensure that prison resources are, first and foremost, reserved for those violent and serious criminal offenders who pose the most dangerous threat to society," and that "alternative sentences" should be considered for less serious offenders); 18 U.S.C. § 3553(a)(2)(D) (directing courts to consider whether sentence will "provide defendants with needed education or vocational training, medical care, or other correctional treatment in the most effective manner"); Edwards, 595 F.3d at 1017 & n.9 (9th Cir. 2010) ("It may very often be that release on probation under conditions designed to fit the particular situation will adequately satisfy any appropriate deterrent or punitive purpose") (quoting S.Rep. No. 98-225, at 92 (1983) as reprinted in 1984 U.S.C.C.A.N. 3182, 3274-75).

Initially, the empirical facts show that Mr. Huizar poses virtually no threat of recidivism or endangering society through future criminal conduct.  As a 55 year-old college graduate with no criminal history points, Mr. Huizar is among the offenders least likely to recidivate in the entire criminal justice system.  See U.S. Sent'g Comm'n,

---

(affirming probationary sentence for repeat-offending 63 year-old defendant despite 27-33 month Guideline range because, while "Bureau of Prisons was capable of providing for [his]" diabetes-related medical care, a "sentence of probation would satisfy the requirement of providing needed care in the most effective manner," and would avoid "simply pass[ing] the cost of [his] medical care on to the taxpayers"); United States v. Marsh, 820 F.Supp.2d 320, 387-88 (S.D.N.Y. 2011) (exercising discretion under § 3553 in fraud case and imposing 12-month sentence on 52-year-old defendant with heart disease and related conditions notwithstanding 108-135 month Guideline range because, among other things, the "defendant's many health problems . . . make it harder for him to serve a prison term").

46

Measuring Recidivism: The Criminal History Computation of the Federal Sentencing
Guidelines at 7, 12-13 (2004); U.S.S.G., Supp. App. C, Amdt. 821 (explaining in the
context of new zero-point offender departure that "[r]ecidivism data analyzed by the
Commission shows, however, that offenders with zero criminal history points have
considerably lower recidivism rates than other offenders, including offenders with one
criminal history point") (citing U.S. Sent'g Comm'n, Recidivism of Federal Offenders
Released in 2010 (2021)); United States v. Ruiz, No. 04-CR-1146-03-RWS, 2006 WL
1311982, at *4 (S.D.N.Y. May 10, 2006) (collecting cases "declin[ing] to impose
Guidelines sentences on defendants . . . over the age of forty at the time of sentencing
on the grounds that such defendants exhibit markedly lower rates of recidivism in
comparison to younger defendants").  And this is even truer given the nature of his
conviction.  Measuring Recidivism, supra, at Ex. 11 (first-time fraud offenders least
likely to recidivate).

But the Court does not need empirical data to know that Mr. Huizar poses no
ongoing threat to society.  Now 55, he has no connection to criminal activity other than
through a position that he will never again hold.  He has also demonstrated a capacity
for responding positively to setbacks, sincerely acknowledged his wrongdoing,
expressed a desire for change, and performed perfectly on pretrial release.  He
maintains strong family ties and support, and has every incentive to scrupulously obey
the law and any supervised-release conditions going forward.  For these reasons, the
USPO rightly recognizes that a term of imprisonment is not necessary to protect society
or prevent Mr. Huizar from re-offending:

> The likelihood of Huizar committing another related offense appears to be
> extremely low given that he no longer holds a public position and there is
> no information that his wrongful actions over his lifetime extended to
> other activities, along with his age and personal background.

Disclosed Recommendation Letter at 8.

Not only is a lengthy custodial term unnecessary to protect the public,
countervailing public-safety considerations affirmatively counsel against one.  As the

47

Court undoubtedly appreciates, families and communities are injured both by crime and

by the disruption wrought by excessive incarceration.  United States v. Haynes, 557

F.Supp.2d 200, 207 (D. Mass. 2008); Donald Braman, Criminal Law and the Pursuit of

Equality, 84 Tex. L. Rev. 2097, 2115 (2006) (explaining that "extended incarceration . .

. has significant costs for non-offenders," including lowering household income,

corroding family structures, increasing childhood abuse, straining familial bonds, and

distorting community norms); Todd R. Clear, Imprisoning Communities: How Mass

Incarceration Makes Disadvantaged Neighborhoods Worse (2007).  Paradoxically,

empirical data show that overly-long sentences may erode public safety more than

shorter ones by severing a person's ties with children and community life.  P. Newton,

et al., Gender, Individuality and the Federal Sentencing Guidelines, 8 Fed. Sent'g Rep.

148 (1995) ("[T]he better family ties are maintained[,] the lower the recidivism rate").

Needlessly long sentences also negatively impact the next generation by leaving

children without the support of a loving parent, exacerbating inequalities, and

perpetuating cycles of instability and family decay.  United States v. Bannister, 786

F.Supp.2d 617, 653 (E.D.N.Y. 2011) ("Prisoners' children may experience numerous

consequences of incarceration, including loss of contact with the incarcerated parent,

strained relationships with caregivers, a diminished sense of stability and safety,

economic insecurity, social stigma, shame, increased risk of drug involvement, and

susceptibility to adverse peer pressure and risky behavior.  These children are at greater

risk of diminished life chances and criminal involvement, and at a greater risk of

incarceration as a result.") (everything omitted).  For these reasons, the 2016 Charles

Colson Task Force concluded that "that our over-reliance on incarceration may in fact

undermine efforts to keep the public safe."  See U.S. Dep't of Justice, Transforming

Prisons, Restoring Lives: Final Recommendations of the Charles Colson Task Force on

Federal Corrections ix (Jan. 2016), https://rb.gy/ttzmsb

      Of course, there are certain cases where a defendant's conduct and character pose

such an acute and significant risk to society that the benefits of lengthy physical

custody outweigh the costs.  But there is no credible suggestion that Mr. Huizar poses any risk of endangering society through future criminal conduct at all, so physically confining him provides virtually no safety benefit to the community.  On the other side of the ledger, he has several family members who depend on him for support and guidance, including his elderly mother and four children.

The painful reality is that, even with a 9-year sentence, Mr. Huizar's mother may die while he is in prison, an incalculable loss that becomes likelier with each additional day of his sentence.  And every moment that he is separated from his children – to say nothing of other family members for whom he has acted as a parental figure – will negatively impact their development and make it harder for them to lead happy and productive lives.  "[W]hile prisoners are obviously not committing crime in their communities while they are incarcerated, they also are not functioning as parents, workers, consumers, or neighbors."  Haynes, 557 F.Supp.2d at 207.

In considering the types of sentences available, Congress has stated that "prison resources are, first and foremost, [meant to be] reserved for those violent and serious criminal offenders who pose the most dangerous threat to society."  Pub. L. No. 98-473, § 239, 98 Stat. 1987, 2039 (1984) (note to 18 U.S.C. § 3551).  Here, not only is a lengthy sentence not necessary to protect the public or achieve specific deterrence, a 9-year sentence, which represents the low end of the 11(c)(1)(C), would be more consistent than a longer one with a holistic approach to public safety and community wellbeing.  See, e.g., Haynes, 557 F.Supp.2d at 203 (where defendant posed limited risk to society and was actively involved in his kids' lives, concluding that "public safety [required] the opposite of the government's request [for additional custodial time]; it requires that [he] be permitted to return to his children so that they do not repeat his errors"); United States v. Johnson, 964 F.2d 124, 125 (2d Cir. 1992) (pre-Booker, affirming a 13-level downward departure for parent raising young kids while emphasizing that "[t]he United States Sentencing Guidelines do not require a judge to leave compassion and common sense at the door to the courtroom"); United States v.

49

Norton, 218 F.Supp.2d 1014, 1019 & n.2 (E.D. Wis. 2002) ("In fashioning an appropriate sentence, a court must consider the public interest. . . . The court cannot ignore the culpability of the defendant.  But neither should it discount society's strong interest in stable families.").

**C. A 9-year sentence would avoid unwarranted disparities and similarities**

A 9-year sentence is also appropriate in light of § 3553(a)(6)'s command to avoid unwarranted disparities among similarly-situated defendants, see 18 U.S.C. § 3553(a)(6), as well as unwarranted similarities among dissimilarly-situated defendants, see Gall, 552 U.S. at 55; United States v. Apodaca, 641 F.3d 1077, 1087 (9th Cir. 2011).  And this is true regardless of whether the metric is aggregate national statistics, high-profile corruption cases with comparable sentencing pressures, or the past and likely future outcomes of other culpable participants in this case.

**1.  A 9-year sentence would more than quadruple the national median and average sentences for first-time offenders in a public-corruption cases, including for nearly-all high-profile public officials who went to trial.**

While it is impossible to get national data beyond a certain level of granularity, the Sentencing Commission's Interactive Data Analyzer compiles nationwide statistics based on primary offense type, criminal history, and other demographic criteria. According to that data, between 2015 and 2022, 1,528 cases were reported to the Sentencing Commission with a primary guideline of 2C1.1, a primary offense of bribery or corruption, and a defendant in CHC I.  Of the defendants who were convicted in those cases, roughly 30% received no time in custody at all.  U.S. Sent'g Comm'n, https://ida.ussc.gov/analytics/saw.dll?Dashboard (under the tab Sentence Outcomes and sub-tab Sentence Type, select Fiscal Years 2015-2022, Crime Type: Bribery Corruption, Primary Guideline: 2C1.1, Criminal History: Category I).  Of the remaining defendants who received custodial terms, 18.2% received a sentence within the originally calculated guidelines, while a dominant majority received a sentence below the guidelines, either as a result of cooperation or downward variances.  Id. (under the tab Guideline Application and sub-tab Sentences Relative to Guideline

50

Range, select Fiscal Years 2015-2022, Crime Type: Bribery Corruption, Primary Guideline: 2C1.1, Criminal History: Category I and calculate the average for the Within Range category (145.3/8=18.1625)).  For those defendants sentenced to prison, the median term of imprisonment was 22 months, and the average was 31.  Id. (under the tab Sentence Outcomes and sub-tab Sentence Length, select Fiscal Years 2015-2022, Crime Type: Bribery Corruption, Primary Guideline: 2C1.1, Criminal History: Category I).[55]  Out of the more than 1,500 defendants convicted of corruption offenses nationwide, just 2.6% received a sentence above 119 months, and only 9.7% received sentences between 60 and 119.  Id.

Of course, every case is different, and Mr. Huizar does not suggest that he is a mine-run defendant.  But he is a person who admitted fault, signed an extensive factual basis, pleaded guilty, and has a number of mitigating characteristics.  Even a 9-year prison term would more than quadruple the median and average sentence nationwide, and would approach the most extreme sentences in all cases prosecuted over, at least, the last eight years.[56]

The command to avoid unwarranted disparities and similarities focuses first on national parity.  United States v. Jaycox, 962 F.3d 1066, 1071 (9th Cir. 2020).  At least by the measure of national statistics, rather than individual cases, the low end of the 11(c)(1)(C) in this case would be a high-end end outlier.

**2. A 9-year sentence would exceed most post-trial outcomes in high-profile corruption cases involving similar sentencing considerations.**

---

[55] The Interactive Data Analyzer includes two different measurements: "average and median sentence length" and "average and median imprisonment length."  The difference between them is that "average sentence length" includes sentences with zero months of prison or conditions of confinement, while "average and median imprisonment length" only includes sentences that include time in prison.  Mr. Huizar has conservatively used the latter number.

[56] The government will presumably contend that this case is especially aggravating.  But the reality is that the participants in a case often overrate its exceptionality based on their proximity to the action and comparative unfamiliarity with the facts of other cases.  The 1,528-case dataset contains many egregious prosecutions involving high-ranking government officials who received personal benefits, denied guilt, and lost at trial.  And every case, including this one, has aggravating and mitigating factors.

51

While national statistics are one way to analyze disparities and similarities,
another approach is to consider cases with similar sentencing pressures.  In that vein,
other high-profile corruption prosecutions are particularly apt comparators because the
principal arguments in favor of a lengthy sentence – the need to send a message, to
deter other officials, and promote respect for the law – are uniquely at play.  As shown
below, this comparison also suggests that a 9-year sentence would, if anything, produce
unwarranted disparities and similarities on the high end:

- **United States v. Ralph Inzunza; CR-03-2434-JTM (S.D. Cal.): 1.75 years after
  conviction at trial.**  After litigating extensively, losing at trial, and with years of
  appellate litigation to follow, former city councilperson sentenced to 21 months for
  taking bribes from strip-club owners to change "no touch" laws.

- **United States v. Bob McDonnell; CR14-12-JRS (E.D. Va.): 2 years after
  conviction at trial.**  After litigating extensively and losing at trial in a well-known
  and highly-publicized "tawdry tales" prosecution, and with years of appellate
  litigation to follow, former governor of major state sentenced to 24 months against
  guidelines of 121-151 months and a government recommendation of a sentence
  within the guidelines.

- **United States v. Paul Paradis; CR-21-540-SB (C.D. Cal.): 2.75 years after plea
  and cooperation.**  After masterminding DWP scandal that cost ratepayers tens of
  millions of dollars, receiving $2 million in kickbacks, bribing a DWP official
  regarding a $30 million "no bid" contract, bribing a DWP board member to secure
  his vote for the contract, and setting up a shell company to receive illegal kickbacks
  – all of which spawned multiple extortion plots to conceal wide-ranging criminal
  activity – lawyer sentenced to 33 months, with apparently no restitution, against a
  government recommendation of 18 months, based on top-down cooperation by the
  orchestrator and principal beneficiary of white-collar crime spree involving local
  municipal agency.

- **United States v. Rick Renzi; CR-08-212-DCB (D. Ariz.): 3 years after
  conviction at trial.**  After litigating extensively, losing at trial, and with years of
  appellate litigation to follow, former congressman sentenced to 36 months against a
  government recommendation of 9-12 years in prison for a case involving bribery,
  insurance fraud, and money laundering in connection with a federal land exchange.

- **United States v. Kyle Foggo; CR-08-79-JCC (E.D. VA.): 3.1 years after pretrial
  guilty plea.**  After litigating extensively, including successful motion to transfer
  venue from San Diego to Virginia, former CIA Executive Director sentenced to 37
  months after taking bribes to steer government contracts.

- **United States v. Ron Calderon; CR-14-103-CAS (C.D. Cal.): 3.5 years after
  pretrial guilty plea.**  After litigating extensively, seeking dismissal on the basis of
  outrageous government conduct, pleading weeks before trial to multiple bribery
  schemes in a 24-count indictment, and undermining his acceptance of responsibility
  through his sentencing position, former California Senator sentenced to 42 months
  against a government recommendation of 60 months.

- **United States v. Mark Ridley-Thomas; CR-21-485-DSF (C.D. Cal.): 3.5 years**

52

**after trial.**  After litigating extensively, conducting a media campaign focused on delegitimizing the prosecution, and losing at trial, former City Councilmember and County Supervisor sentenced to 42 months against a government recommendation of 72 months in a case involving bribery and the allocation of millions of dollars of public funds.

- **United States v. Jack Abramoff; CR-6-1-ESH (D.D.C.): 4 years after pretrial guilty plea.**  Perhaps the most notorious lobbyist in recent history accused of tens of millions of dollars of bribes and kickbacks, sentenced to 48 months, which included a six-level departure for substantial assistance (in revealing crimes that he directed), ordered to run concurrent to a 70-month sentence in a separate case in a different district, effectively making it a no-time sentence.

- **United States v. Dean Skelos; CR-15-317-KMW (S.D.N.Y.): 4.25 years after two trials.**  After litigating extensively, two trials, and with years of appellate litigation after both trials, former Senate Majority leader in New York sentenced to 51 months in a case involving multiple schemes and hundreds of thousands of dollars of payments, of which 18 months were served before release to home confinement due to COVID-19.  In its initial sentencing brief (Docket No 173 starting at 13), the government summarized 10 years of corruption sentences in New York, finding that the average sentence was 6-10 years.

- **United States v. Leland Yee; CR-14-196 (N.D. Cal.): 5 years after pretrial guilty plea.**  Former state Senator sentenced to 60 months after pleading guilty to multiple schemes involving bribery, money laundering, and illegal gun-running involving weapons from the Philippines.

- **United States v. Jasiel Correia; CR-18-10364 (D. Mass.): 6 years after conviction at trial.**  After litigating extensively, losing at trial, and with years of appellate litigation to come, former mayor sentenced to 6 years against a government recommendation of 11 years for multiple schemes involving fraud, bribery, and extortion valued at hundreds of thousands of dollars.

- **United States v. Sheldon Silver; CR-15-93 (S.D.N.Y.): 6.5 years after two trials and three sentencings.**  After litigating extensively, two trials, three sentencings, and with years of appellate litigation after both trials, former Speaker of New York Assembly ultimately sentenced to 6.5 years in a case involving multiple schemes and $4 million dollars in bribe payments.

- **United States v. Duke Cunningham; CR-5-2137-LAB (S.D. Cal.): 8.33 years after pretrial guilty plea.**  In wide-ranging corruption scandal involving millions of dollars in bribes (including a yacht and Rolls Royce) from contractors doing business with the government, Congressman sentenced to 100 months against a government recommendation of 10 years.

- **United States v. Chakkah Fattah; CR-15-346-HB: 10 years after conviction at trial.**  After litigating extensively, losing at trial, and with years of appellate litigation to follow, former Congressman sentenced to 10 years for wide-ranging case involving multiple bribery and fraud schemes.

- **United States v. William Jefferson; CR-07-209 (E.D. Va.): 13 years, but later reduced to time-served (5.5 years).**  After litigating extensively and losing at trial, with years of appellate and post-conviction litigation to follow, former United States Congressman sentenced to 13 years for multiple bribery schemes involving sovereign leaders, the Export-Import bank, and, memorably, cash stashed in a freezer.  Later, and with the government's agreement, Jefferson was re-sentenced to

53

time served, amounting to roughly 5.5 years of actual custody.

- **United States v. Rod Blagojevich; CR-08-888 (N.D. Ill.): 14 years, but later commuted, resulting in release 4 years before scheduled release date (10 years).** After litigating extensively, two trials, and with years of appellate litigation to follow, former governor of major state sentenced to 14 years for multiple fraud and bribery schemes, including selling a U.S. Senate seat for personal gain. Later Presidential commutation resulted in release 4 years early, meaning in an effective sentence of less than 10 years (with good-time credit).

While, again, every case is different in some ways, each of these high-profile cases presented similar sentencing considerations to this one – the need to send a message, to deter other officials, and to promote respect for the law – which the government no doubt pressed with vigor. Nonetheless, a 13-year sentence would be on par with the highest-profile public officials in the most egregious cases who denied responsibility through the end, went to trial, in some cases multiple times, and lost, often after testifying, and still served substantially less than the term imposed. Even a 9-year sentence would place Mr. Huizar near the highest end of the range – perhaps <u>the</u> highest sentence for a noteworthy public official who pleaded guilty with a full admission of fault – and well above many public officials who denied responsibility for egregious conduct and lost at trial.

Along with national statistics, comparable high-profile cases thus also suggest that a 9-year sentence would already be disproportionately long, and that any longer sentence would exacerbate unwarranted disparities and similarities.

### 3. A 9-year sentence would avoid unwarranted disparities and similarities among the culpable participants in this case.

Another lens through which the Court has suggested that it intends to evaluate similarities and disparities is by comparing the culpable participants in this case to one another. <u>See</u>, <u>e.g.</u>, Docket No. 1173 Tr. at 56:3-57:9 (discussion of relative culpability during David Lee's sentencing). Broadly stated, the directly culpable participants fall into four categories: (1) culpable participants who engaged in serious criminal conduct but were not charged at all (Carmel, Neils Cotter, Hazens, Fuer Yuan, Businessperson A, Ricky Zheng); (2) culpable participants who engaged in serious criminal conduct but

54

have sought to reduce their sentences <u>on the premise</u> of truthfully cooperating with the government (George Esparza, George Chiang, Justin Kim, and Morrie Goldman); (3) culpable and allegedly-culpable participants who did not admit fault after being charged and either went to trial or fled (David Lee, 940 Hill, Wei Huang, SZNW, and Ray Chan); and (4) Mr. Huizar, who alone was charged and accepted responsibility without attempting to reduce his sentence by shifting blame.

Initially, as § 3553(a) makes clear, offense conduct and dispositions are not the only factors relevant to comparative sentencing. And the broad categories of culpable participants in this case encompass a remarkably-large range of conduct and characteristics – from foreign billionaires to domestic perjurers. Mr. Huizar also has unique mitigating circumstances, such as his life of good works and public service (which distinguishes him from everyone but Mr. Chan), his mitigating personal history and family responsibilities (which distinguishes him from several defendants), his complete acceptance of responsibility (which distinguishes him from the Category (3) defendants), and his truthful admission of his conduct and willingness to accept substantial punishment (which distinguishes him from some of the Category (2) defendants).

Still, Mr. Huizar acknowledges that his case also involves aggravating factors, including his position of trust and role in the offense. And the Court has indicated that it intends to weigh his criminal culpability against that of others when imposing a sentence. In so doing, the Court has made fairly clear that, based on the information it has received to date, and within the four corners of this case, it considers Mr. Huizar to be the most criminally-culpable participant. Because he is only the second individual to be sentenced in this case, and because, to date, the Court has not been made aware of all of the information necessary to truly assess relative culpability, Mr. Huizar believes that it is important to provide the Court with at least some information about other culpable participants in this case as well. He has done so in a separate document entitled Appendix A.

55

To be clear, his goal in providing this information is <u>not</u> to suggest that he does not bear significant culpability.  Indeed, he has signed a fulsome factual basis in connection with an 11(c)(1)(C) committing him to no less than 9 years in prison.  Instead, it is to show the Court that the true distribution of culpability – and the present need for punishment – is more even than has at times been suggested, implying greater compression across the culpability continuum.  In so doing, Mr. Huizar seeks to further demonstrate that, by any comparative metric, a 9-year sentence, which will likely still be the longest of any in this case, would avoid unwarranted disparities and similarities, while a longer sentence would produce them.

**D. A 9-year sentence is more than sufficient to provide general deterrence, particularly in light of the collateral punishment visited upon Mr. Huizar during this uniquely-public and -personal prosecution.**

In connection with the notion that Mr. Huizar's sentence must "send a message," the government will presumably argue that a 13-year sentence is necessary to promote general deterrence.  But other than emotional appeals or gestures toward the guidelines – which the 11(c)(1)(C) tacitly acknowledges provide little assistance – the government can offer no coherent explanation why, taking everything into account, an appropriate deterrent message will not be achieved by a 9-year sentence.

Initially, empirical research has consistently found that, for economic crimes, it is the fact of detection and conviction, rather than the length of the sentence, that functions as the deterrent.  See <u>United States v. Yeaman</u>, 248 F.3d 223, 238 (3d Cir. 2001) (Nygaard, J., dissenting in part) ("It is widely recognized that the <u>duration</u> of incarceration provides little or no general deterrence for white collar crimes.  For individuals committing these types of crimes, the probability of being apprehended and incarcerated is a powerful deterrent in of itself[.]") (citing A. Mitchell Polinsky & Steven Shavell, <u>On the Disutility and Discounting of Imprisonment and the Theory of Deterrence</u>, 28 J. Legal Stud. 1 (Jan.1999)).  For example, in a 2002 book entitled <u>Corporate Crime, Law, and Social Control</u>, Sally Simpson, Chair of the University of Maryland's Department of Criminology and Criminal Justice, reviewed decades of

56

research and concluded that, for deterrence purposes, the severity of the sanction was far less important than the certainty of punishment.  <u>Accord</u> David Weisburd, et al., <u>Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes</u>, 33 Criminology 587 (1995) (finding no difference in the deterrent effect of prison and probation for white-collar offenders); Zvi D. Gabbay, <u>Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime</u>, 8 Cardozo J. Conflict Resol. 421, 448-49 (2007) (finding "no decisive evidence" supporting "conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders"); Symposium, U.S. Sent'g Comm'n, <u>Federal Sentencing Policy for Economic Crimes and New Technology Offenses, Plenary Session I, "What Social Science can Contribute to Sentencing Policy for Economic Crimes"</u> at 23 (Oct. 12, 2000) ("[T]he general deterrent effect of sanctions stems not so much from the length of the sentence but from fear of the social stigma and ostracism that attends to their imposition").

Consistent with this finding, numerous authorities have recognized that there is "considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders."  <u>See</u> Adelson, 441 F.Supp.2d at 514 (citing R. Frase, <u>Punishment Purposes</u>, 58 Stanford L. Rev. 67, 80 (2005), and E. Szockyj, <u>Imprisoning White Collar Criminals?</u>, 23 S. Ill. U. L.J. 485, 492 (1998)).  And the sentencing commission itself has "concluded that the definite prospect of prison, <u>even though the term may be short</u>, will serve as a significant deterrent" to serious economic crimes.  U.S.S.G. Ch. 1, Pt. A § 4(d) (2018) (emph. added).  Even were the general-deterrence conversation limited exclusively to Mr. Huizar's custodial sentence, therefore, the government can offer no persuasive explanation why a 9-year prison term for a first-time offender following a fulsome guilty plea would not send an appropriate deterrent message.

But the deterrent effect of this prosecution does not derive solely – or perhaps even mostly – from a custodial sentence.  This case began in earnest on November 6,

2018 when federal agents stormed Mr. Huizar's family home and put guns in the faces

of his young children. ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████    Two years later, upon the

filing of a Criminal Complaint, the U.S. Attorney called a rare pandemic press

conference to declare Mr. Huizar a "cancer" and a "disease" upon the city. <u>See</u> Docket

No. 235 at 3 & n.1.  For more than 10 years, federal agents probed every aspect of Mr.

Huizar's life, sending grand-jury subpoenas to his children's schools, listening to the

entirety of his phone calls with his medical providers, reading personal emails with his

friends and family, and soliciting any negative word that could be said about him from

any rival looking to settle a score.

At every step, the case was made public and personal in ways that few in this

District have been.  Between prosecutors and the press, nearly every negative thing that

Mr. Huizar has ever done was paraded before the city, and many things that he did not

do were attributed to him as well.  As a retrospective pall was cast over every aspect of

his life and career, he became a convenient receptacle for every local malady or

grievance about politics.  And despite once being talked about as a rising star and

politician with national potential, he lost not only his reputation, but many longtime

friends, as well as his chosen profession and license to practice law.

Yet the most damaging punishment from this prosecution came not from its

impact on Mr. Huizar, but from its effect on his family.  Once proud to bear the Huizar

name, Mr. Huizar's children have lately worn it with shame and humiliation.  They

have seen their father, a once-proud pillar of the community, caricatured and reduced to

a pariah. ██████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

1  █████████████████████████████████████████████████████

2  ████████████████████████████████████  They have watched their mother loudly

3  implicated in a RICO bribery scheme, ruining her reputation and making her virtually

4  unemployable, even as prosecutors cleared her silently and in private.  See Ex. 15

5  (October 2020 letter describing extensive investigation and concluding that Ms. Rios

6  was "not a target . . . but rather . . . a potential witness").  Every problem in their

7  parents' marriage has been on display for curious observers to inspect and ridicule.  Mr.

8  Huizar's elderly mother was threatened with prosecution for transmitting money at his

9  request.  His brother was charged and pleaded guilty for lying in trial-preparation

10  meetings with prosecutors.

11       At 55 years old, Mr. Huizar has been federally prosecuted, pilloried in the press,

12  lost his career and professional license, and seen his reputation and family destroyed.

13  He is now preparing to enter federal custody for the first time in his life, from which he

14  will emerge in his 60s to experience the "civil death" of a felony conviction.  United

15  States v. Nesbeth, 188 F.Supp.3d 179, 182 (E.D.N.Y. 2016) ("Today, the collateral

16  consequences of a felony conviction form a new civil death").  And although he is

17  already a pariah with limited time and future earning potential, the government is

18  seeking to hit him – and him alone – with crippling monetary penalties that, if imposed,

19  would ensure his and his family's financial ruin as he enters old age.

20       The notion that any public official would look at this picture and say 'well, Mr.

21  Huizar only got 9 years, so, even though his family was destroyed, he was dragged

22  through the public square, and his life was ruined,  I will go ahead and engage in the

23  corruption that I definitely would not have engaged in had he gotten 10 years instead,'

24  is one with no connection to the real world outside the USAO.  Even before Mr. Huizar

25  spends a day in prison, this case will satisfy any conceivable deterrent effect that any

26  prosecution possibly could.  See, e.g., United States v. Gaind, 829 F.Supp. 669, 671

27  (S.D.N.Y. 1993) (pre-Booker, granting downward departure where defendant was

28  punished by the loss of his business); United States v. Vigil, 476 F.Supp.2d 1231, 1235

(D.N.M. 2007) (finding variance appropriate where defendant was collaterally punished by loss of his position and reputation and widespread media coverage); United States v. Smith, 683 F.2d 1236, 1240 (9th Cir. 1982) ("The stigma of a felony conviction is permanent and pervasive.").

Indeed, if anything, the messaging effect of a 13-year sentence in this case would be far different than the government suggests. Rather than warning off wayward officials – who, given the infrequency of charges and the nature of political psychology, will likely continue to write off the prospect of prosecution as remote – the true message for anyone unfortunate enough to be indicted may be that of Roy Cohn: "1. Never settle, never surrender. 2. Counter-attack . . . immediately. 3. No matter what happens, no matter how deeply into the muck you get, claim victory and never admit defeat." Vanity Fair, How Donald Trump and Roy Cohn's Ruthless Symbiosis Changed America (June 28, 2017), https://rb.gy/bq4qso. If officials in the Central District who plead guilty and lose everything still receive the same sentence as William Jefferson and Rod Blagojevich got after trial, the most specific and directly-applicable message is, if you get charged: never admit, attack the prosecution and the proceedings, pursue all-out war up to and including the Supreme Court.

Beyond public officials, there is also another audience for any sentence in this case: the public itself. And while the community is rightly angered by Mr. Huizar's admitted misconduct, it is unlikely that it sees Mr. Huizar as the singular bad apple deserving of criminal punishment. The simmering anger felt throughout the city and the country rests on the perception that the political classes writ large have become corrupt and unaccountable. And it is reasonable to think that that anger burns especially bright not for the rare individual who has humbled himself, admitted fault, expressed sincere remorse, and agreed to a lengthy term in prison, but for those who continue to act with defiant impunity.

Indeed, the redemptive power of contrition and forgiveness are powerful threads running through Mr. Huizar's letters of support. See, e.g., Ex. 1-36 [Alonso Silva ("As

60

someone raised in the Catholic faith, I believe in the power of remorse and contrition.
Despite the serious nature of his offenses, I trust Jose's remorse, contrition and
foundation of faith will guide him towards redemption through rehabilitation,
restitution, and restoration, especially with his family.")]; Ex. 1-17 [Michael Nogueira
("When the news broke, we as a community were broken-hearted to the core.  So,
unlike his character.  We were saddened.  We prayed for him.  He was part of our
community family.  He, by far, was the most outstanding Councilmember our
community has ever experienced.  I'm sure most of his district would welcome him
back.  Lessons are learned and chances to redeem are there."); Ex. 1-29 [James Kee
("Jose carried immense burdens, did a tremendous amount of good for a very large
community, and made some mistakes along the way.  We all bring plusses and minuses
to Judgment Day.  His sins I can't judge, but his contributions will do credit to him")];
Ex. 1-24 [Betsy Starman ("I ask you to please take into consideration the good, the
community, his ability to be fair to ALL of us and his dedication to all of us when you
pronounce his sentence")]; Ex. 1-8 [Father Gabrielli ("As Mr. Huizar has always been
there for our community, I believe the members of our community will look forward to
walking with and supporting Mr. Huizar when he is allowed to reintegrate into society.
We will be there for him as we are for others in our community, and together we all
will find healing and strength to continue our journey.")].  Throwing the book at Mr.
Huizar despite his acceptance of blame because he is the one of many bad actors who
happened to be charged may be just as likely to send not a public message of justice,
but one of arbitrary harshness.

      The "randomness [in] selecting certain offenders to serve as 'examples'" also
raises moral questions about the fairness deterrent sentencing.  J. Temkin, N.Y.L.J.,
Deterrence in an Age of Dwindling Enforcement (March 15, 2018).  Several religious
traditions emphasize principles like discernment, forgiveness, and finding god in all
people and things.   The principle of marginal general deterrence, by contrast, rests on
an exceedingly-rough utilitarian calculation that sentencing one person for longer than

he or she individually deserves will benefit society by warding off some other potential offender in the future.

Moral philosophers have objected to this man-as-instrument practice for hundreds of years.  I. Kant, The Science of Right 195 (W. Hastie trans., 1790) ("Juridical punishment can never be administered merely as a means for promoting another good either with regard to the criminal himself or to civil society, but must in all cases be imposed only because the individual on whom it is inflicted has committed a crime.  For one man ought never to be dealt with merely as a means subservient to the purpose of another, nor be mixed up with the subjects of real right.").  And researchers have rejected it as an economic theory unsupported by real-world evidence.  E.g., Model Penal Code, Sentence of Incarceration § 6:06 (2023), cmt. (f)(2) ("The weight of criminological knowledge teaches that marginal increases in the severity of criminal sanctions rarely bring about marginal improvements in general deterrence in the community.  Criminologists over many decades have failed to find robust empirical evidence in support of the deterrence-through-severity hypothesis . . . . The empirical evidence does support the view that marginal general deterrence can be effected by the increased probability of apprehension for criminal conduct, and accelerated swiftness in the delivery of penalties – sometimes called the 'certainty' and 'celerity' principles.  These mechanisms of general deterrence, however, operate independently of the quantum of punishment dispensed in particular cases.") (collecting studies).

While Mr. Huizar does not suggest that general deterrence should play no role in his sentencing – the law says that it may – he does suggest that it must be thoughtfully calibrated with an eye towards many considerations beyond simply the perceived in terrorem effect of a custodial sentence.  By the utilitarian logic of general deterrence, sentencing every first-time offender to 50 years would rid society of criminal activity.  But few in this county would defend that approach as fair, or even effective.  Here, taking everything into account, a 9-year custodial term following a fulsome plea and catastrophic collateral consequences, is more than sufficient to communicate not only a

62

message of justice, but one of fairness, proportionality, and redemption.

**E. The guidelines – which recommend a multidecade sentence for a nonviolent first-time offender – provide little help in fashioning a parsimonious sentence in this case.**

Although the Court must consider the advisory guidelines as one factor in imposing a sentence, Mr. Huizar respectfully suggests that, for several reasons, the guidelines provide little meaningful assistance in this case.

First, as with the high-loss fraud guidelines, which courts often ignore as "absurd," Adelson, 441 F.Supp.2d. at 515, and a "black stain on common sense," United States v. Parris, 573 F.Supp.2d 744, 754 (E.D.N.Y. 2008), exaggerated guideline calculations frequently give way to other considerations in public-corruption sentencings involving complex individuals who have a lifetime of good works. Indeed, rather than the guidelines, the most common starting point in high-profile corruption cases appears to be other high-profile corruption cases, a representative sampling of which Mr. Huizar has provided above. See, e.g., Skelos; CR-15-317-KMW (after calculating guidelines as 151-188 months for prominent official convicted of three corruption schemes at trial, government recommending 6- to 10-year sentence based not principally on the guidelines, but by comparison to precedent set by other corruption sentences (4.25-year sentence imposed)); McDonnell; CR14-12-JRS (E.D. Va.) (court imposing two-year sentence for major-state governor after conviction at trial despite guidelines of 97-121 months); Renzi; CR-08-212-DCB (D. Ariz.) (court imposing three-year sentence for federal official after trial conviction despite guidelines of 9-12 years); Silver; CR-15-93-VEC (following trial conviction of prominent official for what the government described in sentencing position as "egregious" crimes, including multiple bribery schemes involving millions of dollars, probation office recommended 10 years and court imposed 6.5 despite guideline recommendation of 262-327 months); United States v. Blagojevich; CR-08-888-JBZ, Docket No. 863 (after prevailing at trial and advocating for a guideline level of 42 – the same as in this case before acceptance – government nonetheless acknowledging "that, under the

63

circumstances of this case, the sentence recommended by the correctly calculated guidelines is greater than necessary to achieve the goals of sentencing"); id., Docket No. 1035 at 59:15-19 (Sentencing Tr.) ("[The Court:] And it should be noted that I agree with the government, and with the defense for that matter, that the guideline that I believe is correctly computed for this, which is 30- years to life, is simply not appropriate in the context of this case").

Second, a commonsense comparison to other crimes with similar offense levels demonstrates the unhelpfulness of the guidelines in this case. Mr. Huizar's offense level before acceptance (42) is one shy of the offense level that would have been calculated for the 9/11 attackers, as well as other terrorists and murderers. It is equal to or greater than the offense levels for raping a child (§ 2A3.1; TOL: 42), participating in a quarter-billion-dollar fraud scheme that causes substantial financial hardship to 100,000 working people (§ 2B1.1; TOL: 41), committing second-degree murder (§ 2A1.2; TOL: 38), hijacking a commercial plane (§ 2A5.1; TOL: 38), kidnapping and sexually exploiting someone for 30 days through the use of a weapon (§ 2A4.1; TOL: 38); and many other serious crimes with focused victims that few would consider comparable or deserving of similar punishment.

Third, the very nature of the plea agreement – which stipulates to the guidelines but includes a binding sentencing range far below them – reflects an understanding that the guidelines produce a recommended sentence greater than necessary to achieve the multifaceted purposes of federal sentencing. Indeed, by voluntarily agreeing to a binding range that includes a 9-year sentence, rather than refusing a plea and insisting on trial to seek additional time, the government has tacitly acknowledged that, while it may request additional custody time, even 9 years would be sufficient to achieve the purposes of federal sentencing.

While, again, the Court must consider the guidelines, the unique facts of this case make a one-size-fits-solution drafted in the abstract by a committee in Washington, D.C. minimally useful in fashioning a parsimonious sentence. Instead, as in other

public-corruption cases, the facts and considerations that should drive the sentence are the ones discussed elsewhere in this sentencing position, which call for a 9-year term at the low end of the 11(c)(1)(C).

**F.  While the effect of Mr. Huizar's conduct damaged the community's trust, that was not his intent; and his overall record, including on development, jobs, and affordable housing, was one of transformative and positive progress.**

§ 3553(a)(1) directs sentencing courts to consider the "nature and circumstances" of the of the offense, and particularly the culpability of the offender, when fashioning an appropriate sentence.  United States v. Hack, 443 F.Appx. 304, 305 (9th Cir. July 18, 2011) (indicating that "nature and circumstances" includes intent).  This analysis makes a defendant's motive and intent to do harm highly relevant.  Wisconsin v. Mitchell, 508 U.S. 476, 485 (1993); see also, e.g., United States v. Prosperi, 686 F.3d 32, 41 (1st Cir. 2012) (affirming downward variance to probation from guidelines range of 87-108 months where "advisory guideline range, while accurately calculated, [was] not a fair representation of the defendant's culpability," in part, absent evidence that the defendant "intended to harm the . . . public").  In this case, while the selfish effect of Mr. Huizar's wrongdoing was damaging to the public trust, he did not commit his crimes with a malicious intent to hurt the city by advancing negative policies that he didn't believe in or greenlighting projects that he felt were bad for the community.  His actions were not purposely evil, but indulgent, personally reckless, incrementally self-justifying, and ultimately self-destructive.

Truly understanding the circumstances of this offense requires understanding the day-to-day reality of Mr. Huizar's life and career during the relevant time period.  As an elected official, he was expected to engage with his constituents, respond to their concerns, and express policy and partisan preferences through his actions.  From filling potholes to approving skyscrapers, that often meant playing favorites and choosing sides.  It also meant brokering deals – between affordability and growth, between competing factions, between idealistic demands and budgetary realities.  All of this occurred during 12-hour days fielding calls, meeting constituents, taking votes in

65

multiple Committees and Council, dealing with employee concerns, raising money, and
making countless decisions large and small.

Given the discretion vested in him, constituents and constituencies were
constantly seeking Mr. Huizar's favor and attention.  In the real world, those efforts
often involved not only making campaign contributions, but sometimes hosting events
or providing gifts.  As with any profession, Mr. Huizar also developed personal
relationships with numerous people, and those relationships sometimes also involved
the exchange of benefits and favors.  It was easy for lines to get blurred, and they did.
Indeed, this was true not only for Mr. Huizar, but was and almost certainly remains true
for virtually all of the elected officials in L.A. and beyond.

When it came to development specifically, Mr. Huizar frequently found himself
courted by people of tremendous wealth, as well as other powerful interests that he
supported like construction and labor unions, all of whom were seeking his assistance
to make themselves wealthier still.  Meanwhile, Mr. Huizar was in his late-40s, had
four kids, worked 80 hours a week, drank too much, and, for much of the relevant
period, was a termed-out incumbent who had already served on the Council for over a
decade.

As reflected in several sentencing letters, Mr. Huizar's nearly-two-decade tenure
in public life came at great personal and financial sacrifice to him and his family.
Many politicians are born into wealth or related by blood to other elected officials or
powerful people.  Mr. Huizar, by contrast, had no family connections, was raised in
poverty, had substantial debt, and, with four children, forewent a lucrative career to
pursue a nearly-all-consuming life of public service.  As one childhood friend writes,
this tradeoff was particularly significant for a person who, with no backstop, had the
opportunity to cash in on his hard-won credentials:

> After he graduated from UCLA law, rather than choosing a lucrative
> career as a private attorney, he chose to be a public servant.  When friends,
> including myself, asked him why he chose to be a public servant rather
> than an attorney his response was that he felt his calling was to assist
> others in need and what better place than to come back to his community
> to serve. Even though his friends, including myself, moved on to "better"

neighborhoods, Jose remained in Boyle Heights determined that he could use his education to make positive changes to the area where he grew up and needed positive changes.

Ex. 1-31 [Mauro Arteaga]; see also Ex. 1-35 [Mark Raffield ("Most people with Jose's educational pedigree would have pursued high-paying career path of corporate jobs, but I believe Jose's heart was in improving the lives of working-class folks in his parents' modest neighborhood in East Los Angeles.")].  Mr. Huizar's brother-in-law, James Kee, writes astutely about the unflagging demands of the job as a councilmember that he witnessed firsthand:

> Being a politician is really two jobs, in my opinion: the campaigning and the functions of the office.  They are often overlapping, because the networking that helps win elections also helps bring together projects for revitalizing theater districts.  I don't know how he did it, and I didn't see the thousands of steps that he took along the way, but I occasionally got a glimpse.  I recall one weeknight years ago when I went to an event on Olvera Street, and Jose was at the head table.  He was constantly greeting people, making introductions and listening to constituents while various dignitaries came and went.  For me, it was a dinner.  For him, it was work.  When it was over, I went home to watch a hockey game, and there, between periods, was Jose Huizar in the booth with Bob and Jim talking about hockey in L.A.  I was dumbstruck.  Jose was on stage throughout dinner and probably didn't even eat, and then he went to at least one more event and had to be on stage again long after I was home and comfortable.  It was a sobering realization of the difficulty of doing the job of Councilmember.  On top of all that, he had a daughter at home who was suffering with a life-threatening kidney disease.  He would later have a [child] diagnosed with leukemia at the age of 3.  Through the miracles of modern medicine, both survived, thank God.  Jose carried immense burdens[.]

Ex. 1-29.

At some point along the way, as he was drinking every night, working around the clock, and engaging in a pattern of increasingly-reckless personal conduct, Mr. Huizar fell prey to that all-too-common cynicism and sense of entitlement that affects numerous long-term elected officials.  Surrounded by fabulous wealth, praised for the spectacular transformation of DTLA, working constantly, he indulged, he skimmed off the top both personally and for the benefit of a PAC, and he crossed bright lines that he should not have crossed.

Importantly, however, Mr. Huizar did this while supporting projects that he

67

independently backed, which were good for the city and consistent with his merits-based vision for developing DTLA, rather than pushing harmful legislation or wasting public funds.  Indeed, nobody would have credibly claimed before the raids that Mr. Huizar's record of public achievement, including the DTLA renaissance, was anything other than positive.  And any rhetorical suggestion or anecdotal claim that Mr. Huizar was somehow a detriment to the progress of his district generally or affordable housing specifically – which, as nearly every informed observer would agree, includes <u>all</u> housing in a market economy – is belied by: a comparison of CD-14 before and after his time in office; the widespread praise of DTLA's transformation during his appointment; a comparison of the progress in his district to that of the rest of the city; the housing and affordable-housing-specific construction records set in CD-14 during his tenure; and his role in major housing-related policy initiatives, like Measure HHH and the Linkage Fee.  Also, as discussed above, it was not the case that Mr. Huizar was solely focused on a handful of projects in DTLA while ignoring everything else.  He engaged in this misconduct while, at the same time, continuing to address the many specific concerns of his constituents elsewhere in his district.

To this end, Mr. Huizar feels compelled to address a recurring insinuation from the government that the Mateo project was somehow damaging to goal of affordable housing in L.A.  <u>Now being developed on what was formerly a dirt lot due to planning and zoning dysfunction</u>, the Mateo project will result in the construction of hundreds of market-rate and affordable-reserved housing units, a unique affordable-commercial set aside prioritized by the local community, and a $2 million payment to the CD-14 Affordable-Housing Trust Fund meant to be redistributed to things like expiring rent covenants in Boyle Heights.

The government's false insinuation about the Mateo project appears to be based on a change between the affordable-housing set aside demanded by the unelected and noncareer Mayoral appointees on the CPC – against the wishes of the community and recommendation of DCP staff – which Mr. Huizar (the official elected to represent the

68

Arts District) revised in PLUM.[57]  The reality is far different from what the government
has suggested, and requires a fulsome understanding of the relevant players, the history
of the project, Los Angeles zoning, the impact of the Hybrid-Industrial Ordinance and
its failure, other concurrent approvals in the Arts District (like the Camden project on
1525 Industrial Street), the expressed desires of a vocal Arts District community, and
the multifaceted community benefits package that was ultimately approved.  Because
this story is detailed, Mr. Huizar intends to submit a separate supplement focusing
specifically on Carmel.  For now, he includes several emails, planning memoranda
from Shawn Kuk, letters of support for the final configuration from the community, and
official Council documents which tell just some of the story.  See, e.g., Ex. 16.[58]

As far as Mr. Huizar's other admitted criminal conduct, to reiterate, Mr. Huizar
has pleaded guilty with a fulsome factual basis that he does not dispute.  But a plea
agreement's factual basis is necessarily an underinclusive summary meant to establish
the basis for the guilty plea, not a complete narration of the underlying events.  Because
the Court must consider the complete nature and circumstances of the offense, and
because, like so many other things about this case, the reality is messier and less clear-
cut that has at times been suggested, Mr. Huizar provides the following additional
information about the crimes for which he has pleaded guilty.

Both the FSI and the plea agreement center around a RICO conspiracy involving
an in-fact organization comprised of Mr. Huizar, Raymond Chan, George Esparza,

[57] Notably, this change was not even the subject of the bribe alleged in the FSI.
The FSI alleged that Mr. Huizar conditioned voting against a labor union appeal, which
would have been damaging to Ms. Rios's nascent base of support, on receiving a
$50,000 campaign contribution (which was never made).  See FSI ¶ 56; see also Docket
No. 235-1 ¶ 2 & Ex. 1.
[58] The other projects were equally beneficial to the city.  Indeed, several of the
government's witnesses agreed that, if realized, the skyscraper at the L.A. Grand would
have been a "dream" and a boon to the city.  The Luxe Hotel redevelopment, which
included a number of significant community benefits as part of a Development
Agreement, was part of a critical push to construct not only housing, but additional
hotel capacity of different tiers near the convention center.  Even 940 Hill – which
involves a much different story than the one told at trial – envisioned the construction
of housing units on a parcel that was formerly home to a parking lot and a substantial
TFAR payment.

69

1    Justin Kim, George Chiang, Morrie Goldman, Businessperson A, and others.

2    Operating from February 2013 to November 2018, the premise of the enterprise was

3    that Huizar was the leader, and that the other participants worked loyally and

4    collectively toward the common goal of advancing his, and thus their, political power

5    so that they could extract bribes and benefits.  Generally, as admitted, this is true.

6         What is also true, however, is that the enterprise members were all grown men of

7    significant ambition who sometimes worked together, but often worked independently

8    and at cross-purposes.  Their interactions were frequently transactional.  Their

9    relationships and motives changed.  And they lied to and hid things from each other –

10   perhaps foremost from Mr. Huizar.  See, e.g., Exhibit 17.

11        Over time, as Mr. Huizar was perceived to be unhelpful, he became an

12   increasingly marginal participant.  And to the extent that loyalty existed anywhere, it

13   did not run upward to the supposed "boss," but instead ran sideways between self-

14   professed "brothers" Mr. Esparza, Mr. Chiang, Mr. Kim, and Ricky Zheng (a/k/a the

15   "Korean, Chinese, and Mexican Mafia"); diagonally between Mr. Chiang and "Dailo,"

16   Mr. Chan; and, in the case of Mr. Goldman, to whomever he happened to be speaking

17   at the moment.  See generally Appendix A.

18        None of this means that Mr. Huizar is not guilty of a RICO conspiracy.  Nor does

19   it mean that any of the facts in his plea agreement are untrue.  He is guilty, and the facts

20   are true, which is why he entered a plea.  But, as with most complex human endeavors,

21   the reality is not as simple as the story has sometimes been made out to be.  And, as

22   with many RICO conspiracies in particular, it is easy for appearances, attributions, and

23   labels to get mixed up with a more nuanced factual truth.  Indeed, the whole purpose of

24   charging a case as a RICO conspiracy is to cross-attribute the conduct of members to

25   other members – usually lower to higher – who may not be aware of the specific

26   conduct at the time.

27        There are also further complexities at the level of each individual scheme.  For

28   example:

                                         70

- **L.A. Grand.** After initially having a genuine friendship, Mr. Huizar and Wei Huang had a personal falling out in 2017, before Wei Huang asked for anything meaningful on the skyscraper. At that point, Wei Huang, the billionaire developer who had spent half a decade softening Mr. Huizar up for the "big ask," began threatening to call Mr. Huizar's loan – which involved an amount of money that, to Wei Huang, was truly inconsequential. In April 2018, when agents of Wei Huang filed planning applications for both of his hotels without speaking to Mr. Huizar first, they did so not with the immediate intent to entitle and develop both projects during Mr. Huizar's tenure, but instead to "vest" the projects in advance of the Linkage Fee deadline[59] and avoid the impending transfer tax in the event that the properties were redeveloped in the future. None of this means that Mr. Huizar did not accept benefits from Wei Huang with the intent to be influenced in connection with the skyscraper project, which is the bribe admitted in the factual basis. But the reality is simply more complicated than the version that has at times been presented.

- **Luxe.** Although Mr. Huizar and Fuer Yuan developed a relationship over several meetings and dinners, and although Fuer Yuan donated to other U.S. officials through conduits and his domestic entities, neither Fuer Yuan nor any of his proxies donated to Mr. Huizar's PACS despite several requests. Indeed, the total amount of money that the government contends Mr. Huizar personally received in connection with the Hazens scheme is roughly $10,000 in fringe benefits and travel expenses related to a trip to China. When the Luxe project came up for a hearing at CPC, Mr. Chiang, its chief consultant, relied not only, or even mainly, on Mr. Huizar to push it through – as Mr. Chiang, Mr. Esparza, and others perceived him as unwilling to take significant action to help the project, Ex. 18 – but on Mr. Chan, staff from another council office,[60] and people associated with the Mayor and DCP. When fully entitled, the Hazens project had a Development Agreement, which most developers disliked, and was required to comply with a number of significant conditions and make large payments to the city that no informed observer could construe as unusually favorable. Again, to be clear, none of this means that Mr. Huizar did not accept benefits for himself, procure benefits for a friend, or solicit contributions with the intent to be influenced in connection with the Hazens project; but the relationships and interactions were more complex than they superficially seem.

- **940 Hill.** As alluded to in more detail in Appendix A, the actual facts of the 940 Hill scheme are different than the testimony previously offered at trial. Most notably, the flow of traffic for that scheme was not running from Mr. Huizar to Mr. Esparza – who, not coincidentally, had multiple undisclosed financial interests in 940 Hill – but in the opposite direction. Of course, Mr. Huizar was a knowing participant in the 940 Hill bribe, played a meaningful role, and later asked for the money, all of which demonstrated catastrophic failures of judgment and criminal intent, as admitted. But the surrounding circumstances and progenitor of the bribe are different than suggested.

- **Businessperson A.** While Businessperson A paid Mr. Huizar and other officials to set up meetings with developers related to his purported smart-cabinet

---

[59] As described elsewhere, the Linkage Fee was a transfer tax on large developments that required payments into a citywide affordable-housing trust fund. Scheduled to go into effect in May 2018, the fee prompted a wave of shell applications before the deadline to "vest" projects and avoid the tax.
[60] The government alleges that Mr. Chiang and Mr. Chan provided a staffer from this office gifts and gave one of his relatives a job.

71

business, littered throughout the discovery are comments by Mr. Esparza, Mr. Chiang, Mr. Chan, and others that Businessperson A never followed up on the meetings and may not have even had a saleable product.  It appears that Businessperson A, a serial campaign-finance violator, enjoyed the power associated with having elected officials on his payroll.  In a rare moment of candor, Mr. Esparza said during an early cooperation meeting with the government: "During these meetings Huizar would tell the developer that [Businessperson A] was a good friend and thought it would be a good thing for the introductory meeting.  Huizar rarely pushed for anyone and to Esparza's best recollection he did not 'know that [Huizar] ever made a strong push for anyone,'" including Businessperson A.  At the same time, of course, Mr. Huizar did accept benefits from Businessperson A in connection with promises to set up meetings with developers who Mr. Huizar knew would feel pressure to do business with Businessperson A due to his official influence over their projects.

To again underscore the point above: Mr. Huizar does not offer this information to say that he is not guilty, or to dispute that his misconduct warrants a substantial prison term.  Not only does he agree as a formal matter that he broke the law, he understands in a broader sense that his conduct was and is corrosive to the health of our democratic society because it dissuades people from believing and participating in government, causing them to become atomized and cynical and believe that government as a whole is irretrievably corrupt.  He offers this information only to show that the "nature and circumstances" of the offense were more complicated in the moment, and that his motives and mindset, while inexcusably selfish, were less calculating and consciously malicious, than they may now appear after the fact.  See Gall, 552 U.S. at 52 (in considering the nature and circumstances of the offense, instructing courts to consider "the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue").

**G. A 9-year sentence would promote respect for the law and honor the parsimony principle by sending an appropriately-calibrated message based on all of the circumstances in this case.**

In addition to general deterrence, § 3553 requires courts to consider whether the sentencing imposed will "promote respect for the law" and "just punishment for the offense."  18 U.S.C. § 3553(a)(2)(A).  While the government often treats this factor as unidirectional, promoting respect for the law is rightly understood as a two-way street.  United States v. Stern, 590 F.Supp.2d 945, 956 (N.D. Ohio 2008) ("Respect for the law

72

is promoted by punishments that are fair . . . not those that simply punish for punishment's sake") (emph. in orig.).  A criminal-justice system seen as furiously destroying the unlucky few while letting similar offenders walk free, or blindly layering punishment upon punishment without regard for mitigation or contrition, does more to deride the law than to promote respect.  Gall, 552 U.S. at 54 ("[A] sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing").

In this case, a 9-year sentence would exemplify a criminal justice system capable of nuance and thoughtful calibration.  At the most basic level, Mr. Huizar is a redeemable, if flawed man, who has overcome significant hardships and achieved great things, tried to help his family, friends, and community, failed in the most public and spectacular way, and fully accepted responsibility for his wrongdoing; this is his first conviction and sentence of any kind; he has shown the potential for self-improvement; and he is deeply committed to change, both for his own ends and so he can be there for his family.

None of this means that he doesn't deserve to be punished.  But the parsimony principle, which has roots in moral and religious philosophy, instructs courts to exercise temperance where possible, and if necessary, to err on the side of leniency.  A sentence that balances justice with mercy, punishment with rehabilitation, and legal doctrine with compassion and life experience would promote respect for the law far more than one treating Mr. Huizar as a simplistic caricature or "a small set of numbers artificially assigned to a few arbitrarily-selected variables."  Gupta, 904 F.Supp.2d at 350.  As Father Greg Boyle writes: "Mercy, as Pope Francis says, IS…who our God is."  Ex. 1-7.a.  Under the unique circumstances of this case, a 9-year sentence would be sufficient, if not greater than necessary, to achieve the goals of federal sentencing.

///

Respectfully submitted,

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CUAUHTEMOC ORTEGA
Federal Public Defender

Dated: December 28, 2023

/s/ *Charles J. Snyder*

Charles J. Snyder
Adam Olin
Attorneys for Jose Huizar

74